[S.F. No. 24006. July 14, 1980.]

CLIFFORD K. THOMPSON, JR., et al., Plaintiffs and Appellants, v. COUNTY OF ALAMEDA, Defendant and Respondent.

744

COUNSEL

Merrill J. Schwartz, Lise A. Pearlman, Stark, Stewart, Simon & Sparrowe and Stark, Stewart & Simon for Plaintiffs and Appellants.

Richard J. Moore, County Counsel, E. Melville McKinney, Peter W. Davis, John E. Carne, Judith R. Epstein and Crosby, Heafey, Roach & May for Defendant and Respondent.

James C. Hooley, Public Defender (Alameda), John H. Larson, County Counsel (Los Angeles), Robert C. Lynch, Assistant Chief Deputy County Counsel, Gordon J. Zuiderweg, Deputy County Counsel, George Kading, County Counsel (Santa Barbara), Milton Goldinger, County Counsel (Solano), L. H. Gibbons, District Attorney (Inyo), Raymond Schneider, County Counsel (Humboldt), Stephen Dietrich, County Counsel (Tuolumne), Joseph W. Kiley, District Attorney (Calaveras), Neil B. Van Winkle, County Counsel (Mariposa), Joseph DeWald, County Counsel (Placer), and Dorothy L. Schechter, County Counsel (Ventura), as Amici Curiae on behalf of Defendant and Respondent.

OPINION

RICHARDSON, J.—Plaintiffs appeal from a judgment of dismissal entered in favor of defendant County of Alameda (County) after County's

general demurrer was sustained without leave to amend. We will affirm the judgment.

For purposes of this appeal, those factual allegations of the complaint which are properly pleaded are deemed admitted by defendant's demurrer. (*White* v. *Davis* (1975) 13 Cal.3d 757, 765 [120 Cal.Rptr. 94, 533 P.2d 222].) We recite the gravamen of plaintiffs' causes of action as contained in their amended complaint. Plaintiffs, husband and wife, and their minor son lived in the City of Piedmont, a few doors from the residence of the mother of James F. (James), a juvenile offender. Prior to the incident in question, James had been in the custody and under the control of County and had been confined in a county institution under court order. County knew that James had "latent, extremely dangerous and violent propensities regarding young children and that sexual assaults upon young children and violence connected therewith were a likely result of releasing [him] into the community." County also knew that James had "indicated that he would, if released, take the life of a young child residing in the neighborhood." (James gave no indication of which, if any, young child he intended as his victim.) County released James on temporary leave into his mother's custody at her home, and "[a]t no time did [County] advise and/or warn [James' mother], the local police and/or parents of young children within the immediate vicinity of [James' mother's] house of the known facts. . . ." Within 24 hours of his release on temporary leave, James murdered plaintiffs' son in the garage of James' mother's home.

The complaint further alleges that the death was caused by County's "reckless, wanton and grossly negligent" actions in releasing James into the community (first cause of action); failing to advise and/or warn James' mother, the local police, or "parents of young children within the immediate vicinity" of the residence of James' mother (second cause of action); failing to exercise due care in maintaining custody and control over James through his mother in her capacity as County's agent (third cause of action); and failing to exercise reasonable care in selecting James' mother to serve as County's agent in maintaining custody and control over James (fourth cause of action).

County demurred on the ground that the complaint failed to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)), contending that Government Code sections 818.2, 820.2, 844.6, subdivision (a)(1), 845, 845.8, subdivision (a), and 846, granted County immunity.

We consider, nonsequentially, the validity of each of the alleged causes of action.

## I. THE DECISION TO RELEASE

We note preliminarily that Government Code sections 818.2, 845, and 846 afford the County no immunity. The alleged failures of County do not invoke these statutory immunities because the claimed omissions of County do not involve the adoption or failure to adopt any enactment or lack of enforcement of any law (§ 818.2), the failure to provide police protection (§ 845), or the failure to make an arrest or retain an arrested person in custody (§ 846). ■ Similarly inapplicable is section 844.6, subdivision (a)(1), applicable only to liability for injuries caused by a "prisoner," because a private residence utilized for the custody of delinquent children may not be deemed the equivalent of a prison (*Patricia J.* v. *Rio Linda Union Sch. Dist.* (1976) 61 Cal.App.3d 278, 287 [132 Cal.Rptr. 211]); nor is a minor placed in the custody of his family or foster parents a "prisoner" for purposes of section 844.6.

■ County asserts additionally, however, that sections 820.2 and 845.8 immunize County's release of James into the community. We agree.

In *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 795 [73 Cal.Rptr. 240, 447 P.2d 352], we characterized the determination of whether or not to release an offender as a discretionary decision clothed with immunity under section 820.2 when made by the appropriate authorities. We explained, "The decision to parole thus comprises the resolution of policy considerations, entrusted by statute to a coordinate branch of government, that compels immunity from judicial reexamination." (*Johnson, supra*, at p. 795; see also Welf. & Inst. Code, § 1176.) In the present case, plaintiffs fail to allege that the releasing agent was not empowered to make the determination to release James. It follows that the decision to release James is immune from tort liability under section 820.2.

A further specific immunity within this context is conferred by section 845.8, which explicitly provides that "Neither a public entity nor a public employee is liable for: [¶] (a) Any injury resulting from determining whether to *parole or release* a prisoner...." (Italics added.)

Each of these sections extends to County a statutory immunity for any liability based upon its decision to "release."

## II. The Selection of a Custodian and Supervision of Her Activities

The third and fourth causes of action involve County's selection of James' mother as custodian and its alleged failure adequately to supervise her activities. Plaintiffs assert that these matters are beyond the scope of any decision to release which is immunized by section 845.8, subdivision (a), but rather constitute mere ministerial implementations of a prior discretionary decision and accordingly are not immunized by section 820.2. We disagree.

■ Section 820.2 recites "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." In *Johnson* we rejected a purely mechanical analysis of the term "discretionary." Rather, we both emphasized and evaluated those policy considerations which underlie grants of immunity in order to determine which acts are protected. As we subsequently declared in *McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252, 260-261 [74 Cal.Rptr. 389, 449 P.2d 453], contentions such as those which are made here "have frequently required judicial determination of the category into which the particular act falls: i.e., whether it was ministerial because it amounted 'only to an obedience to orders, or the performance of a duty in which the officer is left no choice of his own,' or discretionary because it required 'personal deliberation, decision and judgment.' (*Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938, 942-943 ... [citations].)"

The discretionary nature of the selection of custodians for potentially dangerous minors and the determination of the requisite level of governmental supervision for such custodians becomes apparent when the underlying policy considerations are analyzed. Choosing a proper custodian to direct the attempted rehabilitation of a minor with a prior history of antisocial behavior is a complex task. (See Simpson, *Rehabilitation as the Justification of a Separate Juvenile Justice System* (1976) 64 Cal.L.Rev. 984, 1003-1015; Nejelski, *Diversion: Unleashing the Hound of Heaven?* in Pursuing Justice for the Child (Rosenheim edit. 1976) p. 94, at pp. 104-116.) The determination involves a careful

consideration and balancing of such factors as the protection of the public, the physical and psychological needs of the minor, the relative suitability of the home environment, the availability of other resources such as halfway houses and community centers, and the need to reintegrate the minor into the community. The decision, requiring as it does, comparisons, choices, judgments, and evaluations, comprises the very essence of the exercise of "discretion" and we conclude that such decisions are immunized under section 820.2.

■ Moreover, as previously noted, section 845.8 immunizes County from liability for "Any injury resulting from determining... the terms and conditions of [a prisoner's] release...." As established in *County of Santa Barbara* v. *Superior Court* (1971) 15 Cal.App.3d 751, 757 [93 Cal.Rptr. 406], immunity under this section is provided when the questioned acts involve policy decisions made prior to or as an integral part of the decision to release. (Accord, *Whitcombe* v. *County of Yolo* (1977) 73 Cal.App.3d 698, 713 [141 Cal.Rptr. 189].) The selection of James' mother as custodian and the degree of supervision to be exercised over her clearly involved such protected policy decisions.

Accordingly, we conclude that County is immune from liability for its selection of a custodian as well as for its determination of the appropriate degree of supervision of the custodian's efforts.

### III. DUTY TO WARN THE LOCAL POLICE, THE NEIGHBORHOOD PARENTS, OR THE JUVENILE'S CUSTODIAN

We now examine the principal and most troublesome contentions of plaintiffs, namely, that County is liable for its failure to warn the local police and the parents of neighborhood children that James was being released or, alternatively, to warn James' mother of his expressed threat. We first inquire whether there would be liability in the absence of immunity (*Smith* v. *Alameda County Social Services Agency* (1979) 90 Cal.App.3d 929, 935 [153 Cal.Rptr. 712]) and determine initially whether in any event County had a duty to warn for the protection of plaintiffs.

As we observed in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], duty "'is a shorthand statement of a conclusion, rather than an aid to analysis in itself.... But it should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the

law to say that the particular plaintiff is entitled to protection.' (Prosser, Law of Torts [3d ed.] at pp. 332-333.)" (P. 734.) Courts, however, have invoked the concept of duty to limit generally "the otherwise potentially infinite liability which would follow every negligent act, . . ." (*Id.*, at p. 739.)

■ The existence of "duty" is a question of law. (*Richards v. Stanley* (1954) 43 Cal.2d 60, 66-67 [271 P.2d 23].) "[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].)

■ It is a fundamental proposition of tort law that one is liable for injuries caused by a failure to exercise reasonable care. ■ We have said, however, that in considering the existence of "duty" in a given case several factors require consideration including "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence · of insurance for the risk involved. [Citations.]" (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; compare *Richards v. Stanley, supra*, and *Hergenrether v. East* (1964) 61 Cal.2d 440 [39 Cal.Rptr. 4, 393 P.2d 164].) When public agencies are involved, additional elements include "the extent of [the agency's] powers, the role imposed upon it by law and the limitations imposed upon it by budget; . . ." (*Raymond v. Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8 [31 Cal.Rptr. 847]; see *Smith v. Alameda County Social Services Agency, supra*, 90 Cal.App.3d 929.) ·

Bearing in mind the foregoing controlling considerations, we examine the propriety of imposing on those responsible for releasing or confining criminal offenders a duty to warn of the release of a potentially dangerous offender who, as here, has made a generalized threat to a segment of the population. Our earlier rulings in *Johnson v. State of California, supra*, 69 Cal.2d 782, and *Tarasoff v. Regents of University of California, supra*, 17 Cal.3d 425, furnish considerable guidance in our inquiry and plaintiffs rely heavily on both cases in support of their view that

County had an affirmative duty to warn someone (the police, the offender's parent, or neighborhood parents) of the dangers arising from James' release.

In *Johnson*, the state, acting through a Youth Authority placement officer, placed a minor with "homicidal tendencies and a background of violence and cruelty" in the plaintiff's home. Following his attack on the plaintiff, she sued the state. In sustaining plaintiff's cause of action, we held "[a]t the outset, we can dispose summarily of the contention, not strenuously pressed by defendant, that the judgment should be affirmed because the state owed no duty of care to plaintiff. As the party placing the youth with Mrs. Johnson, the state's relationship to plaintiff was such that its duty extended to warning of latent, dangerous qualities suggested by the parolee's history or character. [Citations.] These cases impose a duty upon those who create a *foreseeable peril*, not readily discoverable by endangered persons, to warn them of such potential peril. Accordingly, the state owed a duty to inform Mrs. Johnson of any matter that its agents knew or should have known that might endanger the Johnson family...." (*Johnson, supra,* 69 Cal.2d at pp. 785-786, italics added.)

In *Johnson* we emphasized the *relationship* between the state and plaintiff-victim, and the fact that the state by its conduct placed the specific plaintiff in a position of clearly foreseeable danger. In contrast with the situation in *Johnson*, in which the risk of danger focused precisely on plaintiff, here County bore no special and continuous relationship with the specific plaintiffs nor did County knowingly place the specific plaintiffs' decedent into a foreseeably dangerous position. Thus the reasoning of our holding in *Johnson* would not sustain the complaint in this action.

Likewise in *Tarasoff* we were concerned with the duty of therapists, after determining that a patient posed a serious threat of violence, to protect the "foreseeable victim of that danger." (*Tarasoff, supra,* 17 Cal.3d at p. 439.) In reaching the conclusion that the therapists had a duty to warn either "the endangered party or those who can reasonably be expected to notify him,..." (*id.,* at p. 442), we relied on an exception to the general rule that one owes no duty to control the conduct of another. (*Id.,* at p. 435; see Rest.2d Torts (1965) §§ 315-320.) As declared in section 315 of the Restatement, such a duty may arise if "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives the other a right to protection."

We noted in *Tarasoff* that a special relationship existed between the defendant therapists and the patient which *"may* support affirmative duties for the benefit of third persons." (17 Cal.3d at p. 436, italics added.) The *Tarasoff* decedent was the known and specifically foreseeable and identifiable victim of the patient's threats. We concluded that under such circumstances it was appropriate to impose liability on those defendants for failing to take reasonable steps to protect her.

In *Tarasoff*, in reference to the police defendants who had been requested by defendant therapists to detain the patient, we further held that the police had no duty of care to the decedent because there was no "special relationship" between them and either the victim or the patient. We also rejected any application of the principle enunciated in the Restatement to the effect that "If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." (Rest.2d Torts, *supra*, § 321.) We reasoned that "The assertion of a cause of action against the police defendants under this theory would raise difficult problems of causation and of public policy,..." (17 Cal.3d at p. 444, fn. 18.)

We recognized in *Tarasoff* that "the open and confidential character of psychotherapeutic dialogue encourages patients to express threats of violence, few of which are ever executed. Certainly a therapist should not be encouraged routinely to reveal such threats; such disclosures could seriously disrupt the patient's relationship with his therapist and with the persons threatened." (17 Cal.3d at p. 441.) We further concluded that "the therapist's obligations to his patient require that he not disclose a confidence unless such disclosure is necessary to avert danger to others, and even then that he do so discreetly, and in a fashion that would preserve the privacy of his patient to the fullest extent compatible with the prevention of the threatened danger. [Citation.]" (*Ibid.*) Thus, we made clear that the therapist has no *general* duty to warn of each threat. Only if he "does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, [does he bear] a duty to exercise reasonable care to protect the *foreseeable victim* of that danger." (17 Cal.3d at p. 439, italics added.) Although the intended victim as a

precondition to liability need not be specifically named, he must be "readily identifiable." (*Ibid.*, fn. 11; see *Mavroudis v. Superior Court* (1980) 102 Cal.App.3d 594, 599-601 [162 Cal.Rptr. 724].)

Unlike *Johnson* and *Tarasoff*, plaintiffs here have alleged neither that a direct or continuing relationship between them and County existed through which County placed plaintiffs' decedent in danger, nor that their decedent was a foreseeable or readily identifiable target of the juvenile offender's threats. Under such circumstances, while recognizing the continuing obligation of County, as with all public entities, to exercise reasonable care to protect *all* of its citizens, we decline to impose a blanket liability on County for failing to warn plaintiffs, the parents of other neighborhood children, the police or James' mother of James' threat. As will appear, our conclusion is based in part on policy considerations and in part upon an analysis of "foreseeability" within the context of this case.

By their very nature parole and probation decisions are inherently imprecise. According to a recent study by the California Probation Parole and Correction Association, during 1977 in California a total of 315,143 persons (225,331 adults and 89,912 juveniles) were supervised on probation. (The Future of Probation, A Report of the CPPCA Committee on the Future of Probation (July 1979) p. 15.) During the same year, cases removed from probation because of violations totaled 13.4 percent in the superior courts, 14.8 percent in the lower courts, and 11.5 percent in the juvenile courts. (*Id.*, at pp. 27-28.) Additionally, a large number of parole violations occur. National parole violation rates reflect that 18-20 percent of parolees fail on one-year follow-up, 25 percent on two-year follow-up, and 26 percent on three-year follow-up. (*Id.*, at p. 35.) Although we fully recognize that not all violations involve new or violent offenses, a significant proportion do.

Notwithstanding the danger illustrated by the foregoing statistics, parole and probation release nonetheless comprise an integral and continuing part in our correctional system authorized by the Legislature, serving the public by rehabilitating substantial numbers of offenders and returning them to a productive position in society. The result, as we observed in *Johnson*, is that "each member of the general public who chances to come into contact with a parolee bear[s] the risk that the rehabilitative effort will fail. . . ." (69 Cal.2d at p. 799.) The United States Supreme Court very recently reached a similar conclusion in *Martinez v. California* (1980) 444 U.S. 277 [62 L.Ed.2d 481,

100 S.Ct. 553, 557]. In *Martinez*, the high court rejected a contention that the California governmental immunity statutes (Gov. Code, § 845.8 in particular) deprived plaintiffs' decedent of her life without due process of law because of a parole decision that led indirectly to her death. (*Martinez*, 444 U.S. at p. 280-281 [62 L.Ed.2d at pp. 486-487, 100 S.Ct. at p. 557].) The Supreme Court observed that "the basic risk that repeat offenses may occur is always present in any parole system." (*Ibid.*)

■ Bearing in mind the ever present danger of parole violations, we nonetheless conclude that public entities and employees have no affirmative duty to warn of the release of an inmate with a violent history who has made *nonspecific threats of harm directed at nonspecific victims.* Obviously aware of the risk of failure of probation and parole programs the Legislature has nonetheless as a matter of public policy elected to continue those programs even though such risks must be borne by the public. (See *Beauchene v. Synanon Foundation, Inc.* (1979) 88 Cal.App.3d 342, 347 [151 Cal.Rptr. 796].)

Similar general public policy considerations were described in a recent analysis of the *Tarasoff* issue. The author reasoned: "Assume that one person out of a thousand will kill. Assume also that an exceptionally accurate test is created which differentiates with 95% effectiveness those who will kill from those who will not. If 100,000 people were tested, out of the 100 who would kill 95 would be isolated. Unfortunately, out of the 99,900 who would not kill, 4,995 people would also be isolated as potential killers. In these circumstances, it is clear that we could not justify incarcerating all 5,090 people. If, in the criminal law, it is better that ten guilty men go free than that one innocent man suffer, how can we say in the civil commitment area that it is better that fifty-four harmless people be incarcerated lest one dangerous man be free? [Citation.]" (Comment, *Tarasoff and the Psychotherapist's Duty to Warn* (1975) 12 San Diego L.Rev. 932, 942-943, fn. 75.)

Furthermore, we foresee significant practical obstacles in the imposition of a duty in the form that plaintiffs seek, concluding that it would be unwieldy and of little practical value. As previously indicated a large number of persons are released and supervised on probation and parole each year in this state. Notification to the public at large of the release of each offender who has a history of violence and who has made a generalized threat at some time during incarceration or while under supervision would, in our view, produce a cacaphony of warnings that

by reason of their sheer volume would add little to the effective protection of the public.

The issues herein presented are difficult and we are very sensitive to the tragic consequences herein presented, and the necessity, to the extent possible, of preventing their repetition. Plaintiffs assert that if County had made the requested warnings, a different result would have ensued. In deciding whether a duty to warn should be imposed, we inquire under our *Rowland* v. *Christian, supra*, formulation concerning the probable beneficial effect if such warnings were routinely and generally given.

We are skeptical of any net benefit which might flow from a duty to issue a generalized warning of the probationary release of offenders. In our view, the generalized warnings sought to be required here would do little to increase the precautions of any particular members of the public who already may have become conditioned to locking their doors, avoiding dark and deserted streets, instructing their children to beware of strangers and taking other precautions. By their very numbers the force of the multiple warnings required to accompany the release of all probationers with a potential for violence would be diluted as to each member of the public who by such release thereby becomes a potential victim. Such a warning may also negate the rehabilitative purposes of the parole and probation system by stigmatizing the released offender in the public's eye.

Unlike members of the general public, in *Tarasoff* and *Johnson* the potential victims were specifically known and designated individuals. The warnings which we therein required were directed at making those individuals aware of the danger to which they were uniquely exposed. The threatened targets were precise. In such cases, it is fair to conclude that warnings given discreetly and to a limited number of persons would have a greater effect because they would alert those particular targeted individuals of the possibility of a specific threat pointed at them. In contrast, the warnings sought by plaintiffs would of necessity have to be made to a broad segment of the population and would be only general in nature. In addition to the likelihood that such generalized warnings when frequently repeated would do little as a practical matter to stimulate increased safety measures, as we develop below, such extensive warnings would be difficult to give.

a.) *Warning the Police.* In our view, warnings to the police as urged by plaintiffs ordinarily would be of little benefit in preventing assaults upon members of the public by dangerous persons unless we were simultaneously and additionally to impose a concurrent duty on the police to act upon such warnings. As we noted in *Tarasoff, supra,* no such duty to act exists. (17 Cal.3d at p. 444; see also Gov. Code, §§ 845, 846.)

In *Tarasoff* we required that warnings be given directly to the *identifiable* potential victim or to those who, in turn, would advise such individuals of potential danger. In contrast, the requirement that local police be warned would not, in our view, guarantee effective notice to potential victims unless the police also, upon receipt of the warning, were thereupon required to knock on individual doors in the community and give warning, or to provide a 24-hour police escort either for the offender or for all possible victims. Requiring such police action to attend every release of every person who had expressed a generalized intent to commit a violent act against society at large would necessitate the diversion of an inordinate expenditure of time and manpower.

In a somewhat parallel situation, we note that the Legislature has expressly spoken in requiring those who have been convicted of certain sex crimes to inform the police of their presence in the community. (See Pen. Code, § 290.) No similar requirement exists for other kinds of offenders or for persons temporarily released on probation or parole. Furthermore, even section 290 does not require the police to take any specific action to warn the community of the offender's presence, or to supervise the offender's movements. All that is required under the section is recordkeeping by the police which, at the discretion of the police, may be utilized when appropriate. Similar recordkeeping which would be required if regular and numerous warnings such as are requested here were given to the police would create a mass of paper, the upkeep and review of which might well divert police personnel from more effective activities.

Thus, unlike the situation in *Tarasoff,* requiring warning to the police ordinarily would result in no benefit to any potential victims of possible violence.

b.) *Warnings to Parents of Neighborhood Children.* In similar fashion, requiring the releasing agent to warn all neighborhood parents of small children that a potentially dangerous offender had been released

in the area would require an expenditure of time and limited resources that parole and probation agencies cannot spare and would be of questionable value. The magnitude of the problem may be understood in the light of statistics contained in the above cited CPPCA report. In 1978 California probation departments employed a total of 18,331 persons, including professional probation officers, group counselors, clerical staff, business management professionals, psychiatrists, psychologists, medical specialists, other treatment personnel, and 5,156 part-time or volunteer staff members. As previously noted, these personnel exercised supervision over 315,000 probationers "on the streets" during that year. (CPPCA Rep., at p. 16; see also Keldgor & Norris, *New Directions for Correction* (Mar. 1972) 36 Fed. Probation, at p. 3 [a study of California's correctional system].)

Furthermore, such notice might substantially jeopardize rehabilitative efforts both by stigmatizing released offenders and by inhibiting their release. It is also possible that, in addition, parole or probation authorities would be far less likely to authorize release given the substantial drain on their resources which such warnings might require. A stated public policy favoring innovative release programs would be thwarted. (See *Whitcombe v. County of Yolo, supra,* 73 Cal.App.3d 698, 716; *Beauchene v. Synanon Foundation, Inc., supra,* 88 Cal.App. 3d 342, 347.)

c.) *Warning to the Juvenile's Mother.* Finally, notification to the offender's mother of James' threat in our opinion would not have the desired effect of warning potential victims, at least in a case such as that herein presented. In the usual instance we doubt that the mother of the juvenile offender would be likely voluntarily to inform other neighborhood parents or children that her son posed a general threat to their welfare, thereby perhaps thwarting any rehabilitative effort, and also effectively stigmatizing both the mother and son in the community. The imposition of an affirmative duty on the County to warn a parent of generalized threats without additionally requiring, in turn, some affirmative action by the parent would prove ineffective.

The dissent speculates that the mother "might" have taken special care to control her son had she been warned of James' threats, inferring thereby that she would have maintained such constant surveillance over her son as to prevent any possible harm. Such attenuated conjecture, however, cannot alone support the imposition of civil liability. This is particularly true inasmuch as the County's original decision to release

James from close confinement into the obviously less restrictive custody of his mother is a decision we already hold is immunized from liability.

In *Johnson*, cited by the dissent as authority for an obligation to warn, we required notification to those placed in imminent danger by the state's action. There the county had placed a *stranger* into the home and we noted that the failure "to warn the foster parents of latent dangers facing *them…*" (69 Cal.2d at p. 795, italics added) presented a "classic case for the imposition of tort liability" (p. 797). In contrast, the duty sought to be imposed here is that of warning a mother, aware of her son's incarceration for the previous 18 months and not herself endangered, for the remote benefit of a third party, an unidentifiable potential victim. Furthermore, it is contrary to the very purpose of such a release to speculate that a mother in whose care a nearly 18-year-old offender has been temporarily placed would thereby assume the constant minute-to-minute supervision that would have been required to prevent the tragedy.

In summary, whenever a potentially dangerous offender is released and thereafter commits a crime, the possibility of the commission of that crime is statistically foreseeable. Yet the Legislature has concluded that the benefits to society from rehabilitative release programs mandate their continuance. Within this context and for policy reasons the duty to warn depends upon and arises from the existence of a prior threat to a specific identifiable victim. (Cf. *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508].) In those instances in which the released offender poses a predictable threat of harm to a named or readily identifiable victim or group of victims who can be effectively warned of the danger, a releasing agent may well be liable for failure to warn such persons. ■ Despite the tragic events underlying the present complaint, plaintiffs' decedent was not a known, identifiable victim, but rather a member of a large amorphous public group of potential targets. Under these circumstances we hold that County had no affirmative duty to warn plaintiffs, the police, the mother of the juvenile offender, or other local parents.

Because we have concluded that County was either statutorily immunized from liability or, alternatively, bore no affirmative duty that it failed to perform, we need not reach the other contentions raised by County.

The judgment of dismissal is affirmed.

Bird, C. J., Clark, J., Newman, J., and Caldecott, J.,* concurred.

**TOBRINER, J.**—I dissent from the conclusion in part III of the majority opinion that plaintiffs' complaint states no cause of action arising from Alameda County's negligence in failing to warn James' mother that he might harm neighborhood children. In holding that the county is not legally responsible for its negligence, the majority in effect amend the Government Code, creating an immunity from liability which the Legislature has not enacted.

The complaint alleges that the county released James, a juvenile in county custody, to the custody of James' mother. The county knew that James had "extremely dangerous and violent propensities, regarding young children and that sexual assaults upon young children and violence. . . were a likely result of releasing [him] into the community"; it knew also that James had "indicated that he would, if released, take the life of a young child residing in the neighborhood." Nevertheless the county failed to warn either James' mother, the local police, or the parents of neighborhood children of the impending danger. Within 24 hours of James' release to the custody of his mother, he assaulted and murdered Jonathan Thompson, plaintiffs' son.

The issue before us is whether the foregoing allegations state a cause of action for wrongful death against the county. The basis for upholding the complaint is clear and straightforward. The county, having custody of James, stood in a "special relationship" to James that imports a duty to control his conduct and to warn of danger. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435-437 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) The county placed James in the temporary custody of his mother without informing her that James had threatened to kill a neighborhood child. Whether that failure to warn was negligent and proximately caused Jonathan's death are questions of fact which cannot be resolved on demurrer. Since under the alleged facts the county can claim no statutory immunity from liability arising from its failure to warn (see *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 797 [73 Cal.Rptr. 240, 447 P.2d 352]), the complaint states a cause of action.

---

*Assigned by the Chairperson of the Judicial Council

The majority opinion in reaching a contrary result misreads controlling precedent. Although both *Johnson v. State of California, supra*, 69 Cal.2d 782 and *Tarasoff v. Regents of University of California, supra*, 17 Cal.3d 425, involved a failure to warn an identifiable victim, the reasoning of those decisions cannot be confined to that narrow scope. Instead, the cases stand for the principle that a special relationship, such as that between the state and a person in its custody, establishes a duty to use reasonable care to avert danger to foreseeable victims. If the victim can be identified in advance, a warning to him may discharge that duty; if he cannot be identified, reasonable care may require other action. But the absence of an identifiable victim does not postulate the absence of a duty of reasonable care.

Our opinion in *Tarasoff* makes clear that failure to warn a victim who is identifiable does not constitute an essential element of the cause of action. We noted that the duty of care requires the defendant "to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." (17 Cal.3d at p. 431.)

In upholding plaintiffs' cause of action in *Tarasoff*, we relied on a federal district court decision, *Merchants Nat. Bank & Trust Co. of Fargo v. United States* (D.N.D. 1967) 272 F.Supp. 409. In that case the Veterans Administration arranged for a patient to work on a local farm, but did not inform the farmer of the patient's threats to kill the patient's wife. The farmer, unaware of the danger to the wife, permitted the patient to come and go freely during nonworking hours. The patient borrowed a car, drove to his wife's residence, and killed her. The court held the Veteran's Administration liable, not because it failed to warn the wife, but because it failed to notify the farmer of the need to supervise the patient closely.

The principles underlying the *Tarasoff* decision indicate that even the existence of an identifiable victim is not essential to the cause of action. Our decision rested upon the basic tenet of tort law that a "'defendant owes a duty of care to all persons who are *foreseeably* endangered by his conduct.'" (Pp. 434-435, quoting *Rodriquez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 399 [115 Cal.Rptr. 765, 525 P.2d 669].) (Italics added.) The "avoidance of foreseeable harm," we explained, "requires a defendant to control the conduct of another person, or to

warn of such conduct...if the defendant bears some special relationship to the dangerous person or to the potential victim." (P. 435.) The relationship between therapist and patient fulfilled this requirement in *Tarasoff*; the relationship between the county and a juvenile under its custody suffices in the present case.[1]

At no point did we hold that such duty of care runs only to identifiable victims. We cited numerous examples to the contrary. (See 17 Cal.3d at p. 436, cases cited fns. 7 & 8.) One example makes the point particularly clear: "[a] doctor must...warn a patient if the patient's condition or medication renders certain conduct, such as driving a car, dangerous to others." (17 Cal.3d at p. 436; cf. *Harland* v. *State of California, supra*, 75 Cal.App.3d at pp. 475, 482.) It would be absurd to confine that duty to motorists or pedestrians whom the doctor could identify in advance.

Thus under the reasoning of *Tarasoff* and the principles of tort law endorsed in the case, the proper inquiry turns on whether Jonathan Thompson was a foreseeable victim. The complaint alleges that James had threatened to "take the life of a young child residing in the neighborhood"; since Jonathan falls within that description his killing was clearly a foreseeable consequence of James' release and subsequent lack of supervision. Whether Jonathan was also an identifiable victim is relevant not to the existence of a duty of care, but only to whether a warning to Jonathan personally was a reasonable means of discharging that duty. If, as the majority claim, a warning to the neighborhood families was not a reasonable way to reduce the danger, that fact cannot absolve the state of the duty to employ other methods. In particular, it cannot absolve the state from its failure to warn James' mother so that she could exercise proper care in observing and supervising James and thereby preventing the harm that ensued.

[1]*Buford* v. *State of California* (1980) 104 Cal.App.3d 811 [164 Cal.Rptr. 264], also involved an assault upon an allegedly foreseeable but not identifiable victim. The Court of Appeal stated that "[t]he complaint shows that Daniels [the assailant] was confined to Atascadero State Hospital for commission of several criminal offenses and that various personnel were assigned to his rehabilitative care both during commitment and during his leave of absence. The nature of the relationship here resembles those cases [*Tarasoff* v. *Regents of University of California, supra*, 17 Cal.3d 425; *Harland* v. *State of California* (1977) 75 Cal.App.3d 475 (142 Cal.Rptr. 201) (state and resident of veteran's home)] in which a duty was imposed as a matter of law. Although there are substantial questions about the foreseeability of potential victims and the reasonableness of making a public warning about Daniels' release, these are questions for the trier of fact and should not be resolved against plaintiffs at the complaint stage." (104 Cal.App.3d at p. 824.)

Thus no precedent supports the majority's unique attempt to limit the imposition upon defendant of a duty of due care to warn only to a situation in which a person commits a tort upon a victim who can be identified in advance of the wrongful conduct. Even the reading of precedent most favorable to the majority will reveal only that most, but not all, prior cases did involve identifiable victims. Thus the majority position must stand, if it can stand at all, upon the policy considerations it advances.

As to policy considerations, the majority first state that although parole and probation decisions are imprecise, and necessarily present an element of danger to the public, "the Legislature has nonetheless as a matter of public policy elected to continue those programs even though such risks must be borne by the public." (Majority opn. p. 754.) We appreciate the majority's fear that imposition of liability might interfere with the discretion of agencies who must decide whether to grant parole or probation. The Legislature, however, has considered that subject and determined that providing immunity to the state for basic policy decisions is a sufficient safeguard, and that it is unnecessary further to shield the state from liability for implementation of those decisions. As we explained in *Johnson v. State of California, supra*, 69 Cal.2d 782, 799: "once the proper authorities have made the basic policy decision —to place a youth with foster parents, for example—the role of... immunity ends; subsequent negligent actions, such as the failure to give reasonable warnings to the foster parents actually selected, are subject to legal redress."[2]

Twelve years have passed since we filed the decision in *Johnson*. The Legislature has not amended the Government Code to enlarge governmental immunity beyond that described in *Johnson*. We have heard no outcry that *Johnson* imperils the state's parole and probation programs, no claim that the liability for failure to warn imposed by that case has interfered with legislative policy. We thus perceive no need for judicial creation of an expanded immunity.[3]

---

[2]The majority opinion implicitly recognizes the distinction drawn in the quoted language from *Johnson*. In holding plaintiffs' complaint states no cause of action for negligence in releasing James or in selecting his mother as custodian, the majority rely squarely upon statutory immunities; in finding no cause of action for failure to warn the mother, they speak in terms of policy considerations which, presumably, did not persuade the Legislature to enact a corresponding immunity.

[3]It is arguable that imposition of a duty to warn the *general public* whenever a prisoner who might possibly be dangerous is released on parole or probation might, through the impact of repeated warnings, arouse the public to curtail parole and proba-

In sum, whatever policy considerations impelled the Legislature to establish parole and probation programs, the Legislature did not believe those considerations preclude liability for negligent failure to warn. The majority cannot rely on legislative policy to grant a larger immunity than the Legislature has elected to provide. In rejecting the Legislature's judgment, the majority protect the government from liability for its own negligence when the Legislature finds such protection unnecessary.

The policy considerations favoring plaintiffs' cause of action in the present setting—considerations not taken into account by the majority —are weighty and substantial. The principle of compensating victims of negligence in order to recompense their injury and to deter future negligence is fundamental in our judicial system. Thus as a general principle, a plaintiff injured as a proximate result of a defendant's negligence is entitled to compensation. (See Civ. Code, § 1714, subd. (a); *Rodriguez* v. *Bethlehem Steel Corp., supra*, 12 Cal.3d 382, 399.) Even if the government is the tortfeasor, "when there is negligence, the rule is liability, immunity is the exception." (*Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 219 [11 Cal.Rptr. 89, 359 P.2d 457]; *Baldwin* v. *State of California* (1972) 6 Cal.3d 424, 435 [99 Cal.Rptr. 145, 491 P.2d 1121].) Consequently "[u]nless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail." (*Ramos* v. *Madera* (1971) 4 Cal.3d 685, 692 [94 Cal.Rptr. 421, 484 P.2d 93].) In the balance, I believe these basic precepts outweigh the majority's anxiety that the Legislature did not go far enough in immunizing implementation of parole and probation programs.

The other policy considerations advanced by the majority are of less moment. The majority quote a student comment (*Tarasoff and the Psychotherapist's Duty to Warn* (1975) 12 San Diego L.Rev. 932, 942-943, fn. 75) to the effect that predictions of dangerousness are not sufficiently reliable to justify civil commitment of persons as dangerous to others.[4] The present case does not involve civil commitment. Moreover,

---

tion programs. Imposition of numerous sizable judgments for breach of that duty could have the same effect. But neither consideration has any significant bearing upon liability for failure to warn the person to whose custody the prisoner is released.

[4]The quoted language from the San Diego Law Review, while only of tangential relevance to the present case, has serious implications. It implies (a) that *Tarasoff* was wrongly decided, and (b) that the Lanterman-Petris-Short Act (Welf. & Inst. Code,

the argument that predictions of danger are so unreliable that they should not serve as a basis for a warning was expressly rejected in *Tarasoff* (17 Cal.3d at pp. 438-439) and is contrary to legislative policy. (See Evid. Code, § 1024.)

Finally, the majority note the practical problems of warning the public at large. When it comes to warning James' mother, however, the majority say only that she would be unlikely to relay that warning to others in the neighborhood. They do not consider that a mother, when warned that her son is a serious danger to young children, might take special care to watch him, to control his activities, to know his whereabouts, and to make sure he is not alone with small children. Neither do they consider that James' mother as his legal custodian would, given proper warnings, have a legal duty to so control James' behavior. Confined by their narrow concept of warning identifiable victims, the majority do not consider the obvious.

In sum, the policy considerations discussed by the majority relate to the discretionary decision whether to grant parole or probation, the wisdom of civil commitment of dangerous persons, and the practical problems of warning large classes of possible victims. It is striking how little relevance these considerations have to the present case. None bear significantly on the question whether the county should have warned James' mother.

I believe that as a matter of law and common sense the county, before it released James to his mother's custody, had a duty to tell her of his homicidal threats and inclinations. The complaint alleges that the county's failure to warn her was negligent, and proximately caused Jonathan's death. Thus under settled principles of tort law as explained in our prior opinion in *Tarasoff*, the complaint states a cause of action. I would therefore reverse the judgment dismissing plaintiffs' complaint and remand the cause to the superior court for further proceedings.

Mosk, J., concurred.

Appellants' petition for a rehearing was denied August 21, 1980. Manuel, J., did not participate therein. Tobriner, J. and Mosk, J., were of the opinion that the petition should be granted.

---

§ 5000 et seq.) and other statutes providing for commitment of persons dangerous to others are unwise and probably unconstitutional. I doubt that the justices of the majority subscribe to either proposition.