[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTIONS FOR SUMMARY JUDGMENT
On March 15, 1994, 39-year-old Joseph J. ("J.J.") Schlegel, a man with a history of mental health problems, murdered his mother, Anna Gertrude ("Trudy") H. Schlegel, at his home in Kent, Connecticut. Less than twenty-four hours before the murder, J.J. Schlegel had been released to his mother's care and custody by doctors in the Emergency Department of New Milford Hospital, where he had been taken for treatment earlier in the day in the course of an acute psychotic episode.
During that episode, as his doctors observed or were informed about it, J.J. Schlegel had engaged in a wide range of irrational, delusional and violent behavior towards or in the presence of loved ones and caregivers. Such behavior included attempting to choke his friend and housemate, Jeffrey Morgan, violently struggling with ambulance personnel who came to transport him to the Hospital, spitting at and kicking members of the Hospital staff, attempting to bite at least one physician who attended to him, and making inappropriate and delusional utterances throughout the episode.
In addition to the foregoing observations and information about their patient's recent psychotic behavior, the doctors learned several other important facts about him while he was in their care. They learned from his New York psychiatrist that he had had a long history of mental health problems and substance abuse, the former involving bizarre behavior towards his mother. They also learned from blood tests performed at the Hospital that he had a serious potassium deficiency which placed him at risk of experiencing further psychotic disturbances. Notwithstanding this information, the doctors medicated him with Thorazine, at a dosage sufficient to last him until 6 A.M. the following morning, and released him to his mother's care and custody without further evaluation, testing or treatment. Mr. Schlegel would murder his mother approximately eight or nine hours after his initial dose of Thorazine ceased to be effective.
Against this background, the plaintiff executors of the Estate of Trudy H. Schlegel have filed this action to recover damages from three defendants, New Milford Hospital, Dr. Frederick Lohse and Dr. John Adler, whom they claim to have been negligent in treating and releasing J.J. Schlegel from the Hospital on March 14, 1994, and thus to have caused their decedent, Trudy Schlegel's, ensuing violent death. In their three-count Revised Complaint ("Complaint") dated August 20, 1997, the plaintiffs claim that the defendants negligently caused the death of Mrs. CT Page 5540 Schlegel in two related ways.
First, the plaintiffs claim that the defendants negligently failed to control their patient on the day in question, and thereby failed to protect Mrs. Schlegel from him, by releasing him to her care and custody instead of admitting him to the Hospital for further necessary care and treatment for his dangerous condition. In light of what they had witnessed or been told about his recent irrational, psychotic and violent behavior, what they had been told about his mental health history, and what blood tests had revealed about his potassium deficiency, the defendants allegedly knew or should have known that if he were released without further care and treatment, J.J. Schlegel would pose a substantial risk of danger to his mother.
Second, the plaintiffs claim that upon releasing Mr. Schlegel to his mother as aforesaid, the defendants negligently failed to warn her of the substantial risk of danger he posed to her in his current condition. Without such a warning, claim the plaintiffs, Mrs. Schlegel had no reason to know that she was in danger due to her son's condition, much less a basis upon which to recognize possible signs of danger in time to protect herself from it.
The defendants have answered the foregoing allegations either by denying them entirely or by leaving the plaintiffs to their proof at trial. In addition, they have specially pleaded that the plaintiffs' claims against them do not state valid causes of action under Connecticut law.
The case is now before this Court for decision on the defendants' motions for summary judgment. The motions have been supported and opposed by the parties with several substantial memoranda of law and full certified transcripts of deposition testimony from the plaintiff executors, the individual defendants, several Hospital employees, and certain nonparty eyewitnesses to the events of March 14 and 15, 1994. The essential claim presented on both motions is that the defendants are entitled to judgment as a matter of law because, on the factual record before the Court, they owed no legal duty to Mrs. Schlegel either to control their patient, J.J. Schlegel, by keeping him in the Hospital for further care and treatment instead of releasing him to her care and custody, or to warn her, upon his release, of any risk of danger he might then pose to her. For the following reasons, the Court concludes that the defendants' motions must be denied.
 I
To prevail on a motion for summary judgment, the moving party must CT Page 5541 persuade the Court that there is no genuine issue as to any material fact, and thus that it is entitled to judgment as a matter of law. Leesv. Middlesex Insurance Co., 219 Conn. 644, 650, 594 A.2d 952 (1991). In deciding such a motion, the Court's sole task is to determine whether genuine issues of material fact exist, not to resolve those issues on the merits. Only if the evidence and other materials which are submitted with the motion leave no genuine doubt that one or more facts material to the outcome of the case have been established should summary judgment be ordered. The party moving for summary judgment "has the burden of showing the nonexistence of any material fact . . ."; Strada v.Connecticut Newspapers, Inc., 193 Conn. 313, 317, 477 A.2d 1005 (1984); and "that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact."Batick v. Seymour, 186 Conn. 632, 647, 443 A.2d 471 (1982) (1988).
 II
The defendants have based their motions for summary judgment on the rule announced in Fraser v. United States, 236 Conn. 625, 674 A.2d 811
(1996), in which our Supreme Court was called upon to answer the following certified question from the U.S. Court of Appeals for the Second Circuit: "[W]hether, in the circumstances presented herein, psychotherapists undertaking the treatment of a psychiatric outpatient assumed a duty to exercise control over the patient to prevent the patient from committing an act of violence against a third person." Id.
at 626. Answering that question in the negative on the facts presented to it, the Fraser Court declared that in Connecticut, a psychotherapist has no duty to control a psychiatric outpatient to prevent the patient from harming a third person unless he knows or has reason to know that that particular person will harmed. Id. at 626. The Court further specified that for the purpose of this rule, the test of foreseeability of harm to a particular victim is satisfied whenever it is shown either that the victim was a specifically identifiable victim of the uncontrolled patient, or at least that he was a member of a class of the patient's identifiable victims or within the zone of risk of an identifiable victim. Id. at 637.
In applying this rule to the case before it, where the plaintiffs decedent had been attacked and killed by a friend and former employee who was then a psychiatric outpatient at the West Haven Veterans Administration Medical Center, the Fraser Court first acknowledged that it had no independent right or responsibility to find or characterize the facts of that case. Instead, though it recounted those facts in detail in the course of its decision,[1] it fully accepted, as it was required to, the Second Circuit's own description and analysis of those facts.[2]
CT Page 5542
The Second Circuit had "expressly concluded that the record [before it] demonstrated the absence of any objective indicia of [the uncontrolled patient's] propensity to cause harm." Id. at 631. On that basis, it had upheld the District Court's granting of summary judgment on a parallel claim of breach of duty to warn, where the District Court had found, on the facts of record, that the defendant's agents and employees could not have foreseen that the patient in question would harm anyone, or if he did so, that he would attack the plaintiffs decedent or a person within a class of identifiable victims to which the decedent belonged. In light of these findings, the Fraser Court concluded that the question presented for its decision was as follows:
 [W]hether a psychotherapist has a duty to exercise control to prevent an outpatient, who was not known to have been dangerous, from inflicting bodily harm on a victim who was neither readily identifiable nor within a foreseeable class of victims.
Id. at 630.
So framing the certified question, the Fraser Court answered it in the negative for the following four reasons:
 (1) our decisions defining negligence do not impose a duty to those who are not identifiable victims; (2) in related areas of our common law, we have concluded that there is no duty except to identifiable persons; (3) policy reasons inherent in the psychotherapeutic relationship and in the due process rights of mental patients counsel against imposing expansive duties to exercise control over such patients; and (4) courts in other jurisdictions have overwhelmingly declined to extend any duty to control to encompass harm to unidentifiable third persons.
Id. at 632. The Court elaborated upon those reasons as follows.
"Existing Connecticut precedents," observed the Court, "impose only a limited duty to take action to prevent injury to a third person." Id.
"Our point of departure," the Court continued,
 has been that "absent a special relationship of custody or control, there is no duty to protect a third person from the conduct of another. See 2 CT Page 5543 Restatement (Second), Torts § 315 (1965); F. Harper, F. James O. Gray, The Law of Torts (2d Ed. 1986) § 18.7; W. Prosser W. Keeton, Torts (5th Ed. 1984) § 56." Kaminski v. Fairfield, 216 Conn. 29, 33-34, 578 A.2d 1048 (1990); see also Dennison v. Klotz, 12 Conn. App. 570, 578-79, 532 A.2d 1317 (1987), cert. denied, 206 Conn. 803, 535 A.2d 1317 (1988). In any determination of whether even a special relationship should be held to give rise to a duty to exercise care to avoid harm to a third person, foreseeability plays an important role. "Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Although . . . no universal test for [duty] ever has been formulated . . ., our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . Thus, initially, if it is not foreseeable to a reasonable person in the defendant's position that harm of the type alleged would result from the defendant's actions to a particular plaintiff, the question of the existence of a duty to use due care is foreclosed, and no cause of action can be maintained by the plaintiff." (Citations omitted; internal quotation marks omitted.) RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 385-86, 650 A.2d 153 (1994).
Fraser v. United States, supra, 236 Conn. at 632-33.
"In only one instance," the Court continued, had it
 considered what relationships might trigger a special duty of care to protect third parties from personal harm. In Kaminski v. Fairfield, supra, 216 Conn. 34-37, we looked to § 319 of the Restatement (Second), Torts, supra, and to Tarasoff v. Regents of University of California, supra, 17 Cal.3d 431, [17 Cal.3d 425], and its progeny, for guidance as to what might constitute such a special relationship. For present purposes, it is significant that we CT Page 5544 described the duty first articulated in Tarasoff
and further refined in Thompson v. County of Alameda, 27 Cal.3d 741, 752-53, 614 P.2d 728, 167 Cal.Rptr. 70 (1980), as a duty arising out of "a psychotherapist's knowledge of a patient's specific threats against a specific victim, whom the patient subsequently killed." Kaminski v. Fairfield, supra, 37. Our conclusion in Kaminski
that the injured third party had not established a duty to protect him from physical harm rested in part on the fact that he, unlike the victim in Tarasoff, "was not a specifically identifiable victim." Id. We therefore have no precedent for imposing a duty on psychotherapists to exercise control over an outpatient in the absence of a showing that the victim was either individually identifiable or. possibly, was either a member of a class of identifiable victims or within the zone of risk to an identifiable victim.
Fraser v. United States, supra, 236 Conn. at 633-34. (Emphasis added.)
As for related areas of Connecticut negligence law where a similar analysis had been employed, the Court adverted to its prior decisions on municipal immunity. In those decisions, it had been held that municipal employees, who are presumptively immune from liability for negligence in the performance of discretionary governmental acts, are liable for such negligence when the circumstances "make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." Id. at 634. (Emphasis in original; citing and quoting from Mulligan v. Rioux, 229 Conn. 716, 728,643 A.2d 1226 (1994).)
In its discussion of public policy considerations that bore upon its decision, the Court expressed concern for the need to balance "the interests of those injured by psychiatric outpatients against the interests of the mental health profession in honoring the confidentiality of the patient-therapist relationship; see General Statutes §§ 52-146d through 52-146j; and in respecting the humanitarian and due process concerns that limit the involuntary hospitalization of the mentally ill. See State v. Warren, 169 Conn. 207,215-16, 363 A.2d 91 (1975); see also General Statutes §§ 17a-498 and17a-502; Payne v. Fairfield Hills Hospital, 215 Conn. 675, 684,578 A.2d 1025 (1990)." Fraser v. United States, supra, 236 at 635. On that score it concluded as follows on the facts before it: "Whatever that balancing process may indicate in other circumstances, it counselsCT Page 5545against the imposition of liability for harm to unidentifiable victimsor unidentifiable classes of victims of outpatients with no history ofdangerous conduct or articulated threats of dangerous behavior." Id.
(Emphasis added.)
Finally, as to the rulings of other courts on the question presented, the Court observed that they "ha[d] overwhelmingly concluded that an unidentifiable victim has no claim in negligence against psychotherapists who were treating the assailant on an outpatient basis." Id. Certain courts had completely rejected any such duty. Most others, however, had decided to limit the circumstances in which the duty could arise to those special situations in which the particular victim was "either specifically identifiable or within a class of foreseeable victims." Id. at 636.
 Consistent with the foregoing analysis, the Fraser
Court concluded its inquiry as follows:
 These considerations persuade us that, in the circumstances of this case, the medical center owed no duty to control Doe so as to prevent Doe's assault on Fraser. The medical center neither knew nor had reason to know that Doe would attack Fraser because Fraser was not an identifiable victim, a member of a class of identifiable victims or within the zone of risk to an identifiable victim.
Id. at 637. (Emphasis added.)
The upshot of Fraser is that in Connecticut, a psychotherapist does
assume a duty to control his psychiatric outpatient to prevent injury to a third person if he knows or has reason to know that his patient will cause harm to that particular person. To establish that a psychotherapist knew or had reason to know that his patient would harm a particular person, the person must prove that he was either a specifically identifiable victim of the patient, or at least a member of a class of the identifiable victims or within the zone of risk to an identifiable victim of the patient.
Invoking Fraser, the defendants here argue that on this record, there is no evidence from which to infer that any of them knew or had reason to know that their patient, J.J. Schlegel, would harm his mother if he were released to her care and custody on March 14, 1994. On this score, the defendants rely on the following synopsis of the deposition testimony submitted in support of their motions.
CT Page 5546 On March 14, 1994, Trooper Robert Gavell and an ambulance crew responded to a 911 call to the residence of J.J. Schlegel and his companion, Jeffrey Morgan. Mr. Morgan had placed the call because the behavior of J.J. Schlegel was not normal and he was screaming violently. Deposition of Jeffrey Morgan, p. 53. Trooper Gavell met J.J. Schlegel, his mother Gertrude Schlegel who was also present in the house and Jeffrey Morgan. Mr. Schlegel was agreeable to being taken to the hospital, and became combative only when the ambulance crew attempted to place him in restraints. Deposition of Trooper Gavell, pp. 12-13. Trooper Gavell was given a bag of what appeared to be mushrooms. Deposition of Trooper Gavell, p. 27. Trooper Gavelle [sic] thought that J.J. Schlegel had overdosed on drugs. Deposition of Trooper Gavell, p. 15. At the house, J.J. Schlegel made no threats to either his mother or Jeffrey Morgan. Deposition of Trooper Gavell, pp. 8, 53.
 J.J. Schlegel was brought to the emergency room at New Milford Hospital at approximately 10:30 a.m. on March 14, 1994. Mr. Morgan and Gertrude Schlegel followed the ambulance to the hospital. Deposition of Jeffrey Morgan, p. 55.
 Upon J.J. Schlegel's arrival he was yelling, uncooperative, spitting and kicking and attempting to bite the doctor. Deposition of Kathy Woods, p. 25; Deposition of Dr. Lohse, p. 83. Mr. Schlegel was placed in restraints for the safety of himself and the staff. Deposition of Kathy Woods, pp. 28-31. His vital signs were taken by the nursing staff. Deposition of Kathy Woods, p. 37. He was examined by Dr. Frederick Lohse, the emergency room physician. Deposition of Dr. Lohse, p. 101. Dr. Lohse was shown a bag of what appeared to be mushrooms and was told by the state trooper and Jeffrey Morgan that J.J. Schlegel had been acting bizarrely at home. Deposition of Dr. Lohse, p. 88. It was believed that he had taken mushrooms, perhaps a pill or drug in New York City and alcohol the preceding day. Deposition of Dr. Lohse, pp. 88, 95-96.
CT Page 5547 Dr. Lohse ordered Thorazine to calm Mr. Schlegel and a consult with Dr. John Adler, a psychologist. Deposition of Dr. Lohse, pp. 98, 122. The Thorazine was administered at approximately 10:30 a.m., and by 11:30 a.m. J.J. Schlegel was stabilized and his restraints were removed. Deposition of Kathy Woods, pp. 32, 54. J.J. Schlegel remained in the emergency room for another five and one-half hours, until 5:50 p.m., in the company of his mother and Jeffrey Morgan, and during that time it was never necessary to reapply the restraints. Deposition of Kathy Woods, p. 11; Deposition of Mary Austin, p. 44. Nurse Woods, who was working the 7:00 a.m. to 3:00 p.m. shift, never felt threatened by Mr. Schlegel, nor did she observe him threaten anyone present in the emergency room, including his mother. Deposition of Kathy Woods, pp. 97, 99, 112.
 Jeffrey Morgan informed the staff that J.J. Schlegel was HIV positive and that he had been treated by Dr. Brian Sweeney, a psychiatrist in New York City. Deposition of Jeffrey Morgan, p. 56. Dr. Lohse called and spoke to Dr. Sweeney while J.J. Schlegel was in the emergency department. Deposition of Dr. Lohse, p. 97. Although Dr. Lohse does not recollect the specific details of his conversation, he would have told Dr. Sweeney the reason for his call and would have asked Dr. Sweeney about his patient including whether there was any history of violence. Deposition of Dr. Lohse, p. 181. Dr. Sweeney described J.J. as docile and stated that he had a dependent relationship with his mother. Deposition of Dr. Lohse, p. 181. Dr. Lohse himself witnessed what he characterized as J.J. Schlegel's somewhat bizarre dependency on his mother in the emergency department. Deposition of Dr. Lohse, pp. 187-88. J.J. was calling her "mommy" and his mother was hugging him, stroking his head and treating him like an infant. Deposition of Dr. Lohse, p. 188. During the telephone conversation, Dr. Sweeney agreed with the plan to discharge J.J. Schlegel from a psychiatric viewpoint and agreed to see J.J. Schlegel in follow- up the next day. Deposition of Dr. Lohse, p. 181; Deposition of Dr. Sweeney, p. 38.
CT Page 5548 Dr. Adler, the psychologist, saw J.J. on two occasions in the emergency department on March 14, 1994. Deposition of Dr. Adler, p. 70. Dr. Adler felt that J.J. had had an acute psychotic episode probably due to hallucinogenic drugs, and he determined that J.J. was neither a threat to himself nor anyone else. Deposition of Dr. Adler, p. 93.
 J.J. Schlegel was discharged at 5:50 p.m. Deposition of Mary Austin, p. 28; Deposition of Dr. Lohse, p. 221. He was given Thorazine and Benadryl to be taken every 8 hours, if necessary, beginning at 6:00 a.m., instructions to follow up with Dr. Sweeney the next day and to call back if he didn't feel well. Deposition of Dr. Lohse, p. 209; Deposition of Jeffrey Morgan, p. 151. At the time of his discharge J.J. Schlegel was not agitated or combative and nursing personnel observed him to be coherent and appropriate. Deposition of Mary Austin, pp. 48-49. According to Nurse Austin, there was nothing about J.J. Schlegel's behavior that warranted a warning to his mother that he was potentially dangerous at the time of his discharge. Deposition of Mary Austin, pp. 48-49.
 On the following day, Jeffrey Morgan remained at home with J.J. and Gertrude Schlegel until approximately 1:30 or 2:00 p.m. and then left to run some errands — buying sweet potatoes and watering a friend's plants. Deposition of Jeffrey Morgan, p. 80. Sometime that afternoon, after Mr. Morgan left the house, Mr. Schlegel killed his mother. During an altercation with the police at the crime scene, J.J. Schlegel stopped breathing. Deposition of Trooper Gavell, pp. 40-42. Mr. Schlegel was brought by ambulance to the New Milford Hospital emergency department where resuscitation was unsuccessful and he died at approximately 4:50 p.m. Deposition of Floella Toussaint, p. 14.
Memorandum of Law in Support of Motion for Summary Judgment (of New Milford Hospital and Dr. Lohse), pp. 1-5.
According to the defendants, the foregoing facts convincingly CT Page 5549 establish that J.J. Schlegel never harmed or threatened his mother, either on the day they saw him in the hospital or any prior occasion. These facts were confirmed, they further note, by the plaintiff executors, who both testified at deposition that J.J. Schlegel and his mother had had a close relationship, in which, to their knowledge, J.J. had never become violent towards her. Deposition of Philip Schlegel, pp. 15, 19, 61-62, 80; Deposition of Marlis Anne Schlegel Steadman, p. 50. The defendants therefore argue that here, as in Fraser, there is no basis for finding that they had any duty to control their patient for the protection of the plaintiffs' decedent. They claim there are no objective indicia" of their patient's propensity to harm his mother.
The plaintiffs take issue with the defendants' analysis for the following reasons, which this Court finds to be persuasive. Initially, although the record reveals no basis for concluding that J.J. Schlegel ever harmed or threatened his mother before the defendants released him from the Hospital on March 14, 1994, the plaintiffs correctly note that under Fraser, a finding of foreseeable harm to a particular victim need not be based upon such a history of assaults upon or threats of harm made specifically to that victim. Instead, to reiterate, it is enough for a plaintiff to establish that his decedent was a member of a class of identifiable victims to whom the defendants' patient was known or should have been known to pose a risk of harm. The defendants' analysis largely ignores this alternative basis for establishing a duty to control a psychiatric outpatient.
Here, in fact, the record, when construed in the light most favorable to the plaintiffs, clearly suggests the existence of two facts which, if proved at trial, would materially distinguish this case fromFraser and establish a duty, on the part of all defendants, to control J.J. Schlegel for the protection of his mother. First, there is evidence that J.J. Schlegel, unlike the patient in Fraser, was known to have had a very recent history of psychotic and violent behavior. He had, to reiterate, attempted to choke his friend and housemate, Jeffrey Morgan, the night before he was taken to the Hospital for emergency treatment. Such an attack, which was unprecedented in the relationship between Mr. Morgan and J.J. Schlegel, was sufficiently disturbing to Mr. Morgan that when the irrational, delusional behavior which accompanied it recurred the next day, he felt it necessary to have Schlegel taken immediately to the Hospital.
J.J. Schlegel then struggled violently with ambulance personnel when they attempted to transport him to the Hospital. The violence apparently began when efforts were made to put him in restraints before he was transported. Even so, this resort to physical violence towards persons who had come to help him represented an abrupt, unpredictable, and CT Page 5550 seemingly irrational about-face for a man who had originally agreed to be taken to the Hospital. At the Hospital, moreover, J.J. Schlegel's violence continued. He kicked and spit at Hospital staff members who tried to care for him and attempted to bite an attending physician. Throughout this episode, until he was medicated with Thorazine, he made irrational and delusional utterances similar to those he had made during and after his attack on Jeffrey Morgan.
To be sure, the doctors and Hospital personnel who treated Mr. Schlegel suspected that he had ingested psychedelic mushrooms in New York City on or before March 13, 1994. Such ingestion, if it occurred, might well have triggered the psychotic episode that resulted in his initial hospitalization. However, though this drug ingestion hypothesis was supported by Mr. Schlegel's reported history of drug abuse and Jeffrey Morgan's giving of a bag of mushrooms to the police, it was never conclusively established, by drug testing or otherwise, that he had ingested any drugs at all, much less drugs whose effects could have continued, unabated, for over a day. Indeed, since Mr. Schlegel's reported history of drug abuse had never involved violence of any kind, an alternative hypothesis that could not be discounted was that something other than drugs had triggered his psychotic episode. In sum, the defendants had no compelling reason to believe, without further evaluation and treatment of their patient, that even if he stayed away from psychedelic drugs, he would not revert to his dangerous, psychotic state when his Thorazine wore off.
Second, though Mr. Schlegel had not specifically directed any of the above-described acts of violence towards his mother, he had very clearly directed it to a narrow class of persons to which she undeniably belonged and would continue to belong after his release from the Hospital — the class of friends, loved ones, and others who attempted to help and care for him in his psychotic state. Knowing, as they did, that upon releasing J.J. Schlegel to his mother's care and custody, she would bring him to his home, where along with Jeffrey Morgan, she would watch over him, attempt to care for him, and supervise his taking of all necessary medications, the defendants also knew or had reason to know that she would be in the same position of danger, fulfilling precisely the same role, as every other person he had attacked in the preceding twenty-four hours.
J.J. Schlegel, to be sure, was the decedent's loving son. He had never been violent towards his mother, and in fact depended upon her in a complete and infantile way that his psychiatrist and all who saw them at the Hospital described as bizarre. If he were rational and non-delusional, there would be no basis for predicting that he would ever attack his mother. CT Page 5551
The question presented, however, is not whether it was reasonably foreseeable that a rational, non-delusional J.J. Schlegel would attack his mother if he were released from the Hospital to her care and custody. Instead, it is whether, on this record, it was reasonably foreseeable that a psychotic, irrational J.J. Schlegel might so attack her, when for unknown reasons, despite his history of non-violence, had attacked and fought with friends and would-be caregivers over the past twenty-four hours. Because a reasonable jury could so conclude, the defendants' motions for summary judgment must be denied.
IT IS SO ORDERED this 9th day of May, 2000.
 ___________________, J. Michael R. Sheldon