**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAYCEE DUGARD, individually,
and as Guardian Ad Litem, for
her Minor Child,
                    *Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA,
                    *Defendant-Appellee.*

No. 13-17596

D.C. No.
3:11-cv-04718-CTB

OPINION

Appeal from the United States District Court
for the Northern District of California
Carlos T. Bea, Circuit Judge, Presiding

Argued and Submitted January 12, 2016
Pasadena, California

Filed August 26, 2016

Before: Richard R. Clifton and John B. Owens, Circuit
Judges, and William E. Smith,[*] Chief District Judge.

Opinion by Judge Owens;
Dissent by Judge Smith

---

[*] The Honorable William E. Smith, United States Chief District Judge for the District of Rhode Island, sitting by designation.

## SUMMARY[**]

### Federal Tort Claims Act / California Law

The panel affirmed the district court's judgment in favor of the United States, and agreed with the district court that the Federal Tort Claims Act ("FTCA") and its interaction with California law precluded Jaycee Dugard's recovery for the incompetence of the parole office that was supposedly supervising federal parolee Phillip Garrido, who committed unspeakable crimes against Dugard for 18 years.

The FTCA, a limited waiver of the United States' sovereign immunity, provides that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances" under applicable state law.  28 U.S.C. § 2674.

The panel held that in locating an analogous private party under the FTCA, it was appropriate to look to cases involving public entities or public immunities, so long as the policies underlying them were applicable to private parties in the state as well.  The panel further held that because the extent of the federal government's liability under the FTCA was described with reference to state law, when the state has described a public policy for limiting liability for private parties, the government's liability under the FTCA would shrink as well. The panel concluded that limiting liability here, for officials involved in the release and rehabilitation of criminal offenders,  was  consistent  with  California's  policies

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

encouraging criminal rehabilitation for public and private parties alike. The panel concluded that because a private individual in like circumstances would not be liable under California law, the United States cannot be held liable under the FTCA for the conduct of the parole officer here.

Chief District Judge Smith dissented, and would reverse the summary judgment in favor of the United States. Judge Smith wrote that the majority's decision turned on its understanding that the most analogous California cases for the purposes of determining FTCA liability were those involving private rehabilitation centers, and in his view, this was an incorrect application of the FTCA and misinterpreted the body of California tort law.

---

## COUNSEL

Jonathan P. Steinsapir (argued), Dale F. Kinsella, Amber Holley Melius, and David W. Swift, Kinsella Weitzman Iser Kump & Aldisert, LLP, Santa Monica, California, for Plaintiff-Appellant.

Patrick G. Nemeroff (argued) and Mark B. Stern, Attorneys, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., for Defendant-Appellee.

## OPINION

OWENS, Circuit Judge:

Phillip Garrido, a parolee with a terrible history of drug-fueled sexual violence, committed unspeakable crimes against Jaycee Dugard for 18 years. State and federal authorities missed many opportunities to stop these tragic events. Ms. Dugard received a large cash settlement from the State of California for its incompetence, and seeks similar compensation from the Federal Government.

While our hearts are with Ms. Dugard, the law is not. We agree with the district court that the Federal Tort Claims Act and its interaction with California law precludes her recovery for the incompetence of the parole office that was supposedly supervising Garrido. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.   FACTS AND PROCEDURAL HISTORY

### A. Garrido's Criminal History, Convictions, and Kidnapping of Dugard

The sickening circumstances of this case have been detailed many times in various forms, so we limit our discussion to the essential facts.

Garrido's predatory pattern of sexual abuse, often in conjunction with drug use, began in the 1970s. In 1972, he was arrested, though not convicted, for drugging and raping a juvenile. He was using LSD and marijuana during this time. In 1976, Garrido was charged with kidnapping and raping a woman in South Lake Tahoe, California.

That same year, Garrido kidnapped a second woman in South Lake Tahoe, California, and drove her into Nevada, where he hid her in a shed and raped her. He was charged in federal court with kidnapping, and was convicted and sentenced to 50 years imprisonment in 1977. During his trial, Garrido testified and explained that, while under the influence of drugs, he had uncontrollable deviant and violent sexual compulsions. In 1988, he was released on federal parole. His federal parole was set to expire in March 1999, after which the State of California would take over supervision.[1]

Due to his history of sexual violence while intoxicated, Garrido's federal parole terms required him to undergo regular drug testing and counseling. They also banned drug use and excessive alcohol consumption. Parole officers recognized that "the potential for causing great physical harm is present if [Garrido] becomes unstable as a result of drug use." Medical professionals described him as "a time bomb" and "like a pot boiling with no outlet valve." Despite these prophetic warnings and mandatory reporting obligations, in the 30 months after his release on parole, officers did not report approximately 70 documented drug-related parole violations, including methamphetamine abuse, to the Parole Commission. These violations included Garrido drinking

---

[1] The Sentencing Reform Act of 1984 abolished parole for all crimes committed after November 1, 1987. *See Marsh v. Taylor*, 925 F.2d 1131, 1132 (9th Cir. 1991); *see also Fassler v. U.S. Parole Comm'n*, 964 F.2d 877, 878 (9th Cir. 1991); *Farese v. Story*, 823 F.2d 975, 976–77 (6th Cir. 1987) (per curiam). Prior to that, the Parole Commission determined if and when a prisoner could be released on parole, and then ultimately decided if a parolees' performance outside warranted a return to prison. Post-incarceration supervision of federal offenders now takes the form of "supervised release," with district judges ultimately monitoring the performance of offenders with the assistance of federal probation officers.

excessive amounts of water to dilute urine samples used in drug tests.

On June 10, 1991, while Garrido was on federal parole, Garrido and his wife kidnapped Dugard near her home in South Lake Tahoe.[2]  She was only 11.  For the next 18 years, Garrido held Dugard captive, sometimes in chains, in a shed that he built in his backyard.  Often on methamphetamine binges, he repeatedly raped and drugged her.  Dugard gave birth to two of his children without any medical treatment or prenatal care.  Dugard and her children remained captive until their discovery on August 26, 2009.

### B.  Proceedings Before the District Court[3]

In September 2011, Dugard filed a complaint against the United States under the Federal Tort Claims Act (FTCA), on her own behalf and as guardian for her two minor children (A. Dugard and G. Dugard).[4]  In December 2012, Dugard filed a Second Amended Complaint.  In it, she alleged that the government negligently performed numerous mandatory duties when supervising Garrido, including duties to report parole violations in the years prior to her kidnapping.  But for the government's negligence, she alleged, Garrido's parole

---

[2] Garrido had also been prohibited from travel to Lake Tahoe as a condition of his parole.

[3] The Honorable Carlos T. Bea, United States Circuit Judge for the Ninth Circuit, sat by designation as the district court judge, pursuant to 28 U.S.C. § 291(b).

[4] Only Jaycee and A. Dugard remain as plaintiffs (we will refer to them collectively as "Dugard").  G. Dugard voluntarily dismissed her claims.

would have been revoked and he would not have been able to kidnap her in 1991.

Following discovery, the government filed a motion to dismiss and for summary judgment. The government argued that the FTCA bars Dugard's claims because there is no liability for private individuals in like circumstances under California law, as required to sustain an FTCA claim under 28 U.S.C. § 2674.[5]

The district court granted the motion, finding that the proper state-law analogy to the government officials in this case was to private parties providing criminal rehabilitative services. California law holds that such private parties "do not owe a duty of reasonable care to control others to the entire world or to the general public." Instead, "such duty of reasonable care to control is owed by such rehabilitative service providers only to a very small group of specifically identifiable and foreseeable victims." Since Dugard did not allege that she was a specifically identifiable victim, the "United States owed no duty of reasonable care to Plaintiffs in this case."

---

[5] The government also argued that there were two additional bases on which it would prevail: (1) that the discretionary function exception bars Dugard's claims; and (2) that the parole officer's failure to follow mandatory duties did not proximately cause plaintiffs' injuries. Because we agree with the district court that the government faces no liability under the FTCA, we need not address the discretionary function exception or proximate cause issues here.

## II. DISCUSSION

### A.  Standard of Review

We review de novo a district court's dismissal of an FTCA claim because a private person under like circumstances would not be liable under state law.  *Xue Lu v. Powell*, 621 F.3d 944, 947 (9th Cir. 2010).

### B.  The FTCA Forecloses Federal Liability In This Case

The FTCA, a limited waiver of the United States' sovereign immunity, provides that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances" under applicable state law.  28 U.S.C. § 2674; *see also id.* § 1346(b)(1).  Although the federal government "could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy."  *LaBarge v. Mariposa Cty.*, 798 F.2d 364, 367 (9th Cir. 1986).

The most analogous cases to this situation involve the liability of private criminal rehabilitation facilities.  Under California law, private companies that operate rehabilitation programs do not owe a duty of care to the public at large for the conduct of inmates or parolees under their supervision. *See Cardenas v. Eggleston Youth Ctr.*, 238 Cal. Rptr. 251, 252–53 (Ct. App. 1987) (holding that a private rehabilitation facility owes no duty of care to "members of the community in which it is located for the criminal conduct of its residents"); *Beauchene v. Synanon Found., Inc.*, 151 Cal. Rptr. 796, 798–99 (Ct. App. 1979) (holding that a private rehabilitation center owed no duty to the plaintiff to control

the behavior of a convict who escaped the facility and shot the plaintiff). Instead, the private facilities owe a duty only to individuals that are foreseeable and specifically identifiable victims of their wards' conduct. *See Vu v. Singer Co.*, 706 F.2d 1027, 1029 (9th Cir. 1983) (discussing the duty to warn under California law and concluding that it "clearly" requires a "foreseeable and specifically identifiable" victim); *Rice v. Ctr. Point, Inc.*, 65 Cal. Rptr. 3d 312, 316 (Ct. App. 2007) (explaining that a duty exists only where the "injury is foreseeable and the intended victim is identifiable"). This rule is a result of California's strong public policy to encourage "innovative criminal offender release and rehabilitation programs." *Beauchene*, 151 Cal. Rptr. at 799.

As Dugard has not argued, and submits no facts to suggest, that she was a specifically identifiable victim, she would not have a viable claim against an analogous private person under California law.

Dugard contends that *Beauchene*, *Cardenas*, *Rice*, and *Vu* are inappropriate private person analogues because the duties described therein originally arose out of a statutory immunity granted only to public entities—Cal. Gov. Code Section 845.8.[6] As she puts it, using these cases to locate the most

---

[6] The relevant statutory provision states:

> Neither a public entity nor a public employee is liable for:

> (a) Any injury resulting from determining whether to parole or release a prisoner or from determining the terms and conditions of his parole or release or from determining whether to revoke his parole or release.

analogous private parties "backdoor[s] inapplicable state government immunities into the FTCA analysis." As support, she points to the Supreme Court's instruction that the United States' liability under the FTCA may not be defined by reference to the liability of state or local entities. *See United States v. Olson*, 546 U.S. 43, 45 (2005) (rejecting argument that the federal government's liability should be compared to the liability of state and local mine inspectors); *Rayonier Inc. v. United States*, 352 U.S. 315, 318–19 (1957) (rejecting argument that the federal government's liability should be determined by the liability of state and local firefighters); *Indian Towing Co. v. United States*, 350 U.S. 61, 65 (1955) (rejecting argument that the federal government's liability should be compared to the liability of a municipal corporation).

In locating an analogous private party under the FTCA, however, it is appropriate to look to cases involving public entities or public immunities, so long as the policies underlying them are applicable to private parties in the state as well. *See Xue Lu*, 621 F.3d at 947 ("A public-entity case . . . can offer some guidance, to the extent it illuminates general principles of respondeat superior liability that apply in California to public and private employers alike."). The public policy to limit the liability of institutions involved in

---

(b) Any injury caused by:

(1) An escaping or escaped prisoner;

(2) An escaping or escaped arrested person; or

(3) A person resisting arrest.

Cal. Gov. Code. § 845.8.

criminal rehabilitative endeavors is one that California courts have expressly chosen to expand beyond public officials and apply to private parties involved in similar efforts. *See Beauchene*, 151 Cal. Rptr. at 799 (explaining that, although the defendant "concededly is not a 'public entity or public employee' . . . the same public policy that moved the Legislature to immunize *Public* release and rehabilitation programs from liability to encourage such innovations in the interests of criminal justice compels the conclusion that [defendant's] *Private* release and rehabilitation program owed no legal duty to" the plaintiff (emphasis added)); *see also Vu*, 706 F.2d at 1029–30; *Rice*, 65 Cal. Rptr. 3d at 313; *Cardenas*, 238 Cal. Rptr. at 252–53. That application to private parties takes this case out of the ambit of *Olson*, *Rayonier*, and *Indian Towing*. Because the extent of the government's liability under the FTCA is described with reference to state law, when the state has described a public policy for limiting liability for private parties, we expect the government's liability under the FTCA will shrink as well. *Cf. Anderson v. United States*, 55 F.3d 1379, 1381 (9th Cir. 1995) (refusing to limit the liability of the government for the negligence of the U.S. Forest Service because California courts have "not described any such public policy in the area of firesetting and fire control by private persons" that would limit liability). Limiting liability here, for officials involved in the release and rehabilitation of criminal offenders, is consistent with California's policies encouraging criminal rehabilitation for public and private parties alike.

The dissent agrees that due to the "imperative policy objective of encouraging innovative release and rehabilitation programs for criminal offenders," California courts have limited the liability of private criminal rehabilitation centers. Dissent at 28 (quoting *Cardenas*, 238 Cal. Rptr. at 253); *see*

*also* Dissent at 19–20 (quoting *Beauchene*, 151 Cal. Rptr. at 799). We disagree only on whether that policy consideration is applicable to the government actors here. We hold that it is. The United States parole system dealt with "a wide range of individuals with differing problems." Probation Division, Administrative Office of the United States Courts, The Supervision Process, Publication 106, at 21 (1983). Accordingly, like the criminal rehabilitative centers in *Beauchene*, *Cardenas*, *Rice*, and *Vu*, it furthered many different rehabilitative goals, including those "rang[ing] from protecting the public from further crime to providing the offender with needed education, vocational training, medical care, and other correctional treatment." Publication 106, at 1; *see Vu*, 706 F.2d at 1028 ("vocational training, work experience and educational programs"); *Rice*, 65 Cal. Rptr. 3d at 313 (drug rehabilitation program); *Cardenas*, 238 Cal. Rptr. at 251 (youth group home facility); *Beauchene*, 151 Cal. Rptr. at 797 (drug and alcohol rehabilitation). Imposition of broader liability logically forces this range of goals to shift to the former (protecting the public), and away from the latter (education, vocational training, medical, and correctional treatment). This force would disrupt the ability of probation officers to develop a "knowledgeable, sensitive, and flexible approach" suited to each offender, Publication 106, at 21, thereby discouraging "innovative" rehabilitative efforts and "encouraging the detention of prisoners in disregard of their rights and society's needs." *Beauchene*, 151 Cal. Rptr. at 799. The public policy concerns that militate against expansive liability for private criminal rehabilitation programs are therefore directly applicable here.

The dissent instead would have us rely on a line of California cases, particularly involving medical professionals, which has held that a doctor or therapist has a duty to act

reasonably to avoid injury to a third party where a patient expresses an intent to harm or exhibits actions likely to cause harm to a third party (which need not be a foreseeable and specifically identifiable victim).  *See Bragg v. Valdez*, 3 Cal. Rptr. 3d 804, 810–11 (Ct. App. 2003) (holding that a psychotherapist had a duty to the plaintiff not to discharge a mentally ill patient because of his lack of insurance, where patient killed plaintiff after discharge); *Reisner v. Regents of Univ. of Cal.*, 37 Cal. Rptr. 2d 518, 520 (Ct. App. 1995) (holding that the doctor had a duty to the future sexual partner of his teenage patient to warn the patient or "others likely to apprise the [plaintiff] of the danger" that his patient had likely been infected with HIV through a contaminated blood transfusion); *Myers v. Quesenberry*, 193 Cal. Rptr. 733, 734–35 (Ct. App. 1983) (holding that a doctor had a duty to a driver struck by his patient's car to warn his patient that she should not drive in an uncontrolled diabetic condition complicated by a recently lost pregnancy).  These cases rely heavily on *Tarasoff v. Regents of University of California*, 551 P.2d 334 (Cal. 1976), a landmark case in which the California Supreme Court held that, "[w]hen a therapist determines . . . that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger."  *Id.* at 340.

The balance of policy considerations struck in those cases—between the danger of assault or injury to the public on the one hand, and treatment on the other hand—is struck differently from the criminal rehabilitation context.  *Compare Tarasoff*, 551 P.2d at 346–47 (tipping in favor of public safety over concerns related to confidentiality in treatment), *with Beauchene*, 151 Cal. Rptr. at 798–99 (tipping in favor of treatment and rehabilitation over public safety).  "'Duty' is

'an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection' against the defendant's conduct." *Beauchene*, 151 Cal. Rptr. at 798 (quoting William L. Prosser, Torts (4th ed. 1971)); *see also Tarasoff*, 551 P.2d at 342. The "sum total" of the considerations in the criminal rehabilitation context is simply different from the calculus in the cases on which the dissent would have us rely.

Because a private individual in like circumstances would not be liable under California law, the United States cannot be held liable under the FTCA for the conduct of the parole officer here.

## III.    CONCLUSION

"Each member of the general public who chances to come into contact with a parolee or probationer must risk that the rehabilitative effort will fail." *Beauchene*, 151 Cal. Rptr. at 799. Despite this increased danger, rehabilitation is an endeavor the State of California values. Unless we adopt a "throw away the key" approach to convicts, tragic crimes by parolees and probationers inevitably will occur. No judge wants to deny Dugard relief, but the FTCA, through the lens of California law and its focus on rehabilitative efforts, does not permit relief under the circumstances here.

**AFFIRMED.**

SMITH, Chief District Judge, dissenting:

As the majority states, our hearts are with Ms. Dugard. But for the incompetence of both California and federal officials, the unspeakable crimes committed by Garrido would never have occurred. Ms. Dugard has been compensated by California; and in my view she should have her day in court against the federal government as well. I differ with the majority's conclusion that the law does not allow her this, and therefore I respectfully dissent.

The majority's decision turns on its understanding that the most analogous California cases for the purposes of determining liability under the Federal Tort Claims Act ("FTCA") are those involving private rehabilitation centers. In my view, this is an incorrect application of the FTCA and misinterprets the body of California tort law of which the so-called private rehabilitation center cases are an inextricable part.

As the majority notes, the FTCA is a limited waiver of sovereign immunity and provides that the United States is liable for the negligent conduct of its employees "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *see also* 28 U.S.C. § 1346(b). When determining whether a state actor is analogous to a private entity, courts must "interpret these words to mean what they say, namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a '*private person*' liable in tort." *United States v. Olson*, 546 U.S. 43, 44 (2005) (emphasis in original) (quoting 28 U.S.C. § 1346(b)(1)). And, when conducting this analysis, common sense dictates that "where the government and its private party counterpart diverge in a

significant respect, that circumstance must be taken into account in determining what is the 'most reasonable analogy.'" *Bush v. Eagle-Picher Indus., Inc.*, 927 F.2d 445, 452 (9th Cir. 1991) (quoting *LaBarge v. Mariposa County*, 798 F.2d 364, 367 (9th Cir. 1986)), *abrogated on other grounds by Scheuring v. Traylor Bros.*, 476 F.3d 781, 783 (9th Cir. 2007).

Here, on the surface, the "private rehabilitation center cases" cited by the government and relied on by the majority[1] provide a tempting analogue to the United States Parole Commission because both deal broadly with individuals who have broken the law and are in some stage of incarceration, transition on parole/probation, or supervision; however, upon closer examination, it is clear that these cases represent an *exception* to the general rule under California tort law that, where there is a special relationship, there is a duty to warn or control that extends to foreseeable, but not readily identifiable victims, provided that the action required would be reasonable and not futile. As I explain in detail below, the courts in the private rehabilitation center cases effectively granted those facilities a form of immunity—essentially a carbon copy of the immunity enjoyed by their public counterparts—because they found that the public policy considerations were so strong as to preclude a finding of a duty. Irrespective of the majority's suggestion to the contrary, no such considerations are present in this case, and there is virtually no policy reason to extend this narrow judicially created immunity to U.S. Probation. Thus, it is the

---

[1] *See generally Vu v. Singer Co.*, 706 F.2d 1027 (9th Cir. 1983); *Rice v. Ctr. Point, Inc.*, 154 Cal. App. 4th 949 (Ct. App. 2007); *Cardenas v. Eggleston Youth Ctr.*, 193 Cal. App. 3d 331 (Ct. App. 1987); *Beauchene v. Synanon Found., Inc.*, 88 Cal. App. 3d 342 (Ct. App. 1979).

general body of "special relationship" cases, rather than the private rehabilitation center exception, that provides a closer private party analogue, and summary judgment in favor of the government is not warranted.

## I.  The Duty to Control or Warn under California Law

In order to set the stage for the private person analogy analysis on which this case turns, and to understand where I part company with the majority, a chronological review of the development of California tort law concerning the duty to control and/or warn is necessary.

In 1966, in *Poncher v. Brackett*, 246 Cal. App. 2d 769 (Ct. App. 1966), a California Court of Appeals held that grandparents had a duty to an unidentifiable victim of their violent grandson.  The court explained that:

> The governing principle is expressed in section 319 of the Restatement Second of Torts as follows: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

*Id.* at 772–73.  The court clarified that "[t]he ability to control the child, rather than the relationship as such, is the basis for a finding of liability on the part of a parent."  *Id.* at 772.  That is, it was not because it was a grandparent-child relationship in particular that the duty attached, but rather because it was

some type of "special relationship" in which there was an ability to control.

In *Johnson v. State*, 69 Cal. 2d 782 (1968), the Supreme Court of California found that state employees had a duty to warn foster parents of the violent criminal history of a teenage parolee placed in their care. In so holding, the Court found that the state employees did not have immunity under Government Code section 845.8, which provides that: "Neither a public entity nor a public employee is liable for: (a) Any injury resulting from determining whether to parole or release a prisoner or from determining the terms and conditions of his parole or release or from determining whether to revoke his parole or release." *Id.* at 795 n.9 (quoting Cal. Gov't Code § 845.8); *see id*. at 795–96. In giving this narrow application to section 845.8, the court reasoned that "[o]nce an official reaches the decision to parole to a given family, however, the determination as to whether to warn the foster parents of latent dangers facing them presents no such reasons for immunity." *Id*. at 795. The court added that "[t]his analysis, allowing immunity for basic policy decisions . . . but rejecting it for the ministerial implementation of that basic policy, receives support from a long line of cases in California and in federal courts, interpreting similar 'discretionary' language in section 2680, subdivision (a), of the Federal Tort Claims Act." *Id.* at 796.

Eight years later, in the landmark case *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425 (1976), the Supreme Court of California considered whether a therapist had a duty to warn a person threatened by a patient, notwithstanding the general confidentiality obligations of that profession. There, the therapist had notified the police of a threat made by the patient, but did not notify the specific

person about whom the threat had been made—Tatiana Tarasoff—or her parents. *Id.* at 430–31. The court held "that defendant therapists cannot escape liability merely because Tatiana herself was not their patient" because the "special relationship" between therapist and patient created a duty "to use reasonable care to protect the intended victim against such danger." *Id.* at 431. What constitutes "reasonable care," the court said, depends on the circumstances: "it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, *or to take whatever other steps are reasonably necessary under the circumstances*." *Id.* at 431 (emphasis added).

In 1979, *Beauchene v. Synanon Foundation, Inc.*, 88 Cal. App. 3d 342 (Ct. App. 1979), considered whether a private rehabilitation facility could be held liable for the criminal conduct of a convict who, after being released into the defendant's care, escaped and injured the plaintiff. The plaintiff argued that the facility had been negligent in screening the convict and that he should never have been let into the program. *Id.* at 345. The issue in *Beauchene* was whether the facility owed the plaintiff a duty based on the "special relationship . . . between the defendant and the active wrongdoer." *Id.* at 347 (citing *Tarasoff*, 17 Cal. 3d at 435). The court found no liability on public policy grounds. *Id.* at 348. The court first explained that under California law:

> Principal policy considerations in deciding whether a duty exists include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to

the defendant's conduct, the policy of
preventing future harm, the extent of the
burden to the defendant and consequences to
the community of imposing a duty to exercise
care with resulting liability for breach, and the
availability, cost, and prevalence of insurance
for the risk involved."

*Id.* at 347 (quoting *Rowland v. Christian*, 69 Cal. 2d 108, 113
(1968)). With that framework in mind, the court found that
"[a]lthough appellant's injuries may be grievous, '[of]
*paramount concern* is the detrimental effect a finding of
liability would have on prisoner release and rehabilitation
programs. Were we to find a cause of action stated we would
in effect be encouraging the detention of prisoners in
disregard of their rights and society's needs.'" *Id.* at 348
(emphasis added) (quoting *Whitcombe v. County of Yolo*,
73 Cal. App. 3d 698, 716 (1977)). In order to address the
paramount concern about the effect that liability would have
on the development of innovative prisoner release and
rehabilitation programs, the Court reached for the immunity
cloak provided by section 845.8 to public entities and
employees discussed and distinguished in *Johnson*, and
applied it to private facilities as if they were public:

> Respondent concededly is not a "public entity
> or public employee" within the meaning of
> section 845.8. But the same public policy that
> moved the Legislature to immunize *public*
> release and rehabilitation programs from
> liability—to encourage such innovations in
> the interests of criminal justice—compels the
> conclusion that respondent's *private* release
> and rehabilitation program owed no legal duty

> to this appellant. In light of the purpose
> behind the governmental immunity, it would
> be incongruous to hold that, while the state is
> immune from liability for its decision to
> assign Bentley to, and his unauthorized
> departure from, the Synanon program, the
> program itself owed appellant a duty not to
> accept Bentley or to prevent his unauthorized
> departure.

*Id.* (emphasis in original). Thus, the *Beauchene* decision was driven by the court's conclusion that "[t]o hold respondent civilly liable would deter the development of innovative criminal offender release and rehabilitation programs, in contravention of public policy." *Id.*

Following *Beauchene*, the Supreme Court of California decided *Thompson v. County of Alameda*, 27 Cal. 3d 741 (1980). There, a juvenile offender who was released from a county detention facility into the custody of his mother had threatened that, if released, he would kill a young child in the neighborhood. *Id.* at 746. The court held that the county of Alameda had no duty to warn the neighborhood parents, the police, or the child's mother. *Id.* at 758. The court explained that "[i]n deciding whether a duty to warn should be imposed, we inquire under our *Rowland v. Christian*, [69 Cal. 2d 108, 113 (1968)], formulation concerning the probable beneficial effect if such warnings were routinely and generally given." *Id.* at 755. The court then reasoned:

> We are skeptical of any net benefit which
> might flow from a duty to issue a generalized
> warning of the probationary release of
> offenders. In our view, the generalized

> warnings sought to be required here would do
> little to increase the precautions of any
> particular members of the public who already
> may have become conditioned to locking their
> doors, avoiding dark and deserted streets,
> instructing their children to beware of
> strangers and taking other precautions.

*Id.* The court distinguished *Johnson* and *Tarasoff* because in those cases there was a specifically identifiable victim, and therefore a warning would not have been futile or against public policy:

> [I]t is fair to conclude that warnings given
> discreetly and to a limited number of persons
> would have a greater effect because they
> would alert those particular targeted
> individuals of the possibility of a specific
> threat pointed at them. In contrast, the
> warnings sought by plaintiffs would of
> necessity have to be made to a broad segment
> of the population and would be only general
> in nature. In addition to the likelihood that
> such generalized warnings when frequently
> repeated would do little as a practical matter
> to stimulate increased safety measures, as we
> develop below, such extensive warnings
> would be difficult to give.

*Id.* at 755. The court acknowledged that, "[i]n those instances in which the released offender poses a predictable threat of harm to a named or readily identifiable victim or group of victims *who can be effectively warned of the danger*, a releasing agent may well be liable for failure to warn such

persons." *Id.* at 758 (emphasis added). With respect to the police, the court noted that "warnings to the police as urged by plaintiffs ordinarily would be of little benefit in preventing assaults upon members of the public by dangerous persons unless we were simultaneously and additionally to impose a concurrent duty on the police to act upon such warnings. As we noted in *Tarasoff*, *supra*, no such duty to act exists." *Id.* at 756. Finally, regarding the juvenile offender's mother, the court reasoned that:

> notification to the offender's mother of James' threat in our opinion would not have the desired effect of warning potential victims, at least in a case such as that herein presented. . . . The imposition of an affirmative duty on the County to warn a parent of generalized threats without additionally requiring, in turn, some affirmative action by the parent would prove ineffective.

*Id.* at 757. As with the police, because the mother did not have a duty to take some affirmative action upon receiving the information about her son's threat, the court found that the warning would not have been effective.

Notably, Justice Tobriner, the author of *Johnson* and *Tarasoff*, dissented from the majority's formulation, finding that the failure to warn the mother *did* state a cause of action. Justice Tobriner explained that "the absence of an identifiable victim does not postulate the absence of a duty of reasonable care." *Id.* at 760. "Instead, [*Johnson* and *Tarasoff*] stand for the principle that a special relationship, such as that between the state and a person in its custody, establishes a duty to use

reasonable care to avert danger to foreseeable victims. If the victim can be identified in advance, a warning to him may discharge that duty; if he cannot be identified, reasonable care may require other action." *Id.* The fact that the specific victim was not identifiable in advance "cannot absolve the state from its failure to warn James' mother so that she could exercise proper care in observing and supervising James and thereby preventing the harm that ensued." *Id.* at 761. The majority countered this argument—not by disputing the dissent's formulation of the law concerning an identifiable victim—but instead by noting that "[t]he dissent['s] speculat[ion] that the mother 'might' have taken special care to control her son had she been warned of James' threats" was "attenuated conjecture," which "cannot alone support the imposition of civil liability." *Id.* at 757. Moreover, the majority explained, "it is contrary to the very purpose of such a release to speculate that a mother in whose care a nearly 18-year-old offender has been temporarily placed would thereby assume the constant minute-to-minute supervision that would have been required to prevent the tragedy." *Id.* at 758.[2]

At the heart of the majority's decision in *Thompson* was a deep concern about expanding the reach of *Johnson*—which held that statutory immunity under section 845.8 did not protect a county from liability for failure to warn of danger disconnected from the decision to parole—and *Tarasoff*—which cemented the probability of liability for failure to warn

---

[2] The Court's conclusion on this point is dubious to be sure: a warning to the mother might very well have been effective; for example, reporting a threatening presence to the police and community is a mainstay of sex offender notification laws, both state and federal. *See* Sex Offender Registration and Notification Act, Pub. L. No. 109-248, Title I (2006). But that debate is beyond the scope of the question here.

in special relationship situations—to require that the government issue "generalized warnings" to the public every time a parolee is released.[3]  Indeed, the question before the court in *Thompson* was actually quite narrow:  "[W]e examine the propriety of imposing on those responsible for releasing or confining criminal offenders *a duty to warn of the release* of a potentially dangerous offender who, as here, has made a generalized threat to a segment of the population." *Id.* at 750 (emphasis added).  Looking to *Beauchene* for support, the court found that these generalized warnings would be against public policy:

> Furthermore, such notice might substantially jeopardize rehabilitative effort both by stigmatizing released offenders and by inhibiting their release. It is also possible that, in addition, parole or probation authorities would be far less likely to authorize release given the substantial drain on their resources which such warnings might require.  A stated public policy favoring innovative release programs would be thwarted.

*Id.* at 757.  The majority found further support in the fact that "the County's original decision to release James . . . is a

---

[3] Although *Thompson* considers the duty of a public entity, its holding provides an important basis for the private rehabilitation cases that follow. Accordingly, the justifications for the holding in *Thompson* also form the justifications for exempting private rehabilitation facilities from their special duty—public policy concerns and the futility of any warning.  As detailed below, neither of these justifications apply to federal parole officers, a difference that warrants looking to other analogous private entities.

decision we already hold is immunized from liability." *Id.* at 757–58.

On the heels of *Thompson*, this Circuit upheld the finding of no duty in a case where a Job Corps program failed to control its residents. *Vu v. Singer Co.*, 706 F.2d 1027, 1030 (9th Cir. 1983). The Court came to this conclusion for two reasons. First, it found that California law with respect to the duty to warn mandates that the "victim must be foreseeable and specifically identifiable." *Id.* (citing *Thompson*, 27 Cal. 3d 741). Second, the Court pointed to the same policy concerns voiced in *Beauchene:*

> To impose on the operator of a center a duty to prevent the tortious acts of corps members and to impose liability to the victims of such acts for having failed to do so would place in some degree of jeopardy the Job Corps program and its efforts towards the rehabilitation of disadvantaged young people. Faced with such potential liability an operator with any concern for its economic survival could be expected to terminate from the corps any person whose conduct suggests that he might pose a risk, whether it otherwise justifies termination or not. This would deprive of the program's benefits those most in need of rehabilitation.

*Id.*[4]

---

[4] Judge Rothstein filed a concurrence in *Vu*, which recognized that the Court was bound by *Thompson*, but criticized that decision (relying on Justice Tobriner's dissent) as "enunciat[ing] a myopic view of

One month later, however, *Myers v. Quesenberry* clarified the holding of *Thompson*, stating that "the fact [that the plaintiff] was a foreseeable but not a readily identifiable victim . . . does not preclude him from stating an action." 144 Cal. App. 3d 888, 892 (Ct. App. 1983). In *Myers*, a doctor had failed to warn a patient not to drive due to her uncontrolled diabetic condition; she struck the plaintiff, who sued the doctor. The court's analysis centered on the fact that "[a]s a practical matter, the doctors here could not have effectively warned [the plaintiff victim] Myers of the danger presented by [the patient] Hansen's driving. . . . However, they could easily have warned Hansen not to drive because of her irrational and uncontrolled diabetic condition." *Id.* at 892–93 (citations omitted). Of significance was the fact that "this probably would not have been a futile act. Having otherwise complied with her doctors' professional recommendations, Hansen presumably would have continued to follow their advice had they warned her not to drive." *Id.* at 893. The court distinguished this holding from *Thompson*—not because it involved a doctor-patient relationship, as the majority argues—but because the warning would not, as a matter of law, have been futile: "Hansen is unlike the homicidal actors in *Thompson* and *Tarasoff* . . . . On these pleadings, we cannot factually presume Hansen would have ignored the doctors' warning." *Id.* Therefore the court concluded that "under these circumstances *where warning the actor is a reasonable step to take in the exercise of the standard of care applicable* to physicians . . . , liability is not conditioned on potential victims being readily identifiable as well as foreseeable. *Id.* (emphasis added) (citing *Thompson*, 27 Cal. 3d at 752–53, 758; *Mavroudis v.*

foreseeability in the context of the duty to warn and to supervise." *Vu*, 706 F.2d at 1031 (Rothstein, J., concurring).

*Superior Court*, 102 Cal. App. 3d 594, 599–601 (Ct. App. 1980)).

In 1987, *Cardenas v. Eggleston Youth Center*, 193 Cal. App. 3d 331 (Ct. App. 1987), again shielded a private rehabilitation facility from liability. As with *Beauchene*, the result was wholly driven by public policy:

> We are persuaded that the public policy concerns that led the *Beauchene* court to find no duty on the part of that respondent should lead us to the same conclusion in the case at bar. We recognize that plaintiff has been grievously injured, but to permit him recourse against defendant would have a potentially devastating impact on private rehabilitation programs. Such programs, particularly in these times of overcrowded penal facilities, serve an indispensable public function. Forced to choose between the competing interests presented in this case, we must, like the *Beauchene* court, without in the least minimizing the seriousness of the injury to the individual, defer to the imperative policy objective of encouraging innovative release and rehabilitation programs for criminal offenders.

*Id.* at 335–36. The fact that the victims were not specifically identifiable again did not factor into the analysis.

In 1995, a California Court of Appeals reached a similar decision to that in *Myers* in *Reisner v. Regents of University of California*, 31 Cal. App. 4th 1195 (Ct. App. 1995). There,

a doctor failed to inform a patient, Jennifer, that she had contracted HIV from a blood transfusion. *Id.* at 1198. She later infected her partner, Daniel, who sued the doctor. *Id.* As in *Myers*, the court held that "[f]or several reasons, it is immaterial that, in *Tarasoff*, the therapist knew the identity of his patient's intended victim whereas, in this case, Defendants did not know Daniel or even that he existed." *Id.* at 1199. In particular, "warning Jennifer would have been a *reasonable step to take* in the exercise of the standard of care applicable to physicians . . . and *we cannot factually presume Jennifer or her parents would have ignored Defendants' warning*." *Id.* at 1200 (emphasis added).

In 2003, *Bragg v. Valdez*, 111 Cal. App. 4th 421 (Ct. App. 2003), held a psychiatrist liable for releasing a dangerous patient from a psychiatric hospital because the patient did not have insurance. The court noted that "without receiving any therapy, and without any notification to any other mental health care provider or the police, Lee was turned loose into an unsuspecting community. . . . It is foreseeable that someone who is dangerous to others is liable to act out and be dangerous." *Id.* at 431. The court explained:

> This rule is in accordance with *Tarasoff* and subsequent case law that holds, "When the avoidance of foreseeable harm to a third person requires a defendant to control the conduct of a person with whom the defendant has a special relationship (such as physician and patient) or to warn the person of the risks involved in certain conduct, the defendant's

> duty extends to a third person with whom the
> defendant does not have a special
> relationship."

*Id.* at 432 (quoting *Reisner*, 31 Cal. App. 4th at 1198).

The court also found that the psychiatrist was not immune under two state statutes: one granting immunity to psychiatrists who release patients prior to the end of the initial 72-hour commitment, and another, enacted after *Tarasoff*, that mandated that there could be no monetary liability to warn of a patient's threats "except where the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims." *Id.* at 432–34. The court reasoned that "[t]his case is not dealing with judgment calls, but a dereliction of judgment." *Id.* at 435. Thus, it did not fall under the purview of either of these statutes, the first of which was enacted to prevent the "inappropriate, indefinite, and involuntary commitment of mentally disordered persons" by protecting a doctor's assessment of whether or not the person is a danger; and the second, which "sought to protect [] the privileged communications between a psychotherapist and his or her patient in a treatment setting." *Id.* at 432–35. Moreover, the court found that "the trial court erred [] in analyzing this case as a *Tarasoff* case." *Id.* at 434. Concluding that the "complaint [did] not allege a failure to warn a known victim," but instead concerned "a negligent release based upon factors other than the professional judgment that is required when a psychiatrist treats an individual who is a danger to himself or to others," the court held that "*Tarasoff* [was] inapplicable." *Id.*

In 2007, a California Court of Appeals again found that a private rehabilitation center did not owe a duty to the general public in its vicinity. *Rice v. Ctr. Point, Inc.*, 154 Cal. App. 4th 949, 959 (Ct. App. 2007). In *Rice*, the court implicitly acknowledged that the fact that the plaintiffs were not identifiable victims was not fatal to their claim: the court first noted that "[h]ere, it is clear that defendants did not owe a duty to the plaintiffs as the foreseeable victims of the residents' criminal conduct," but then went on to state that "*[t]he more difficult question is whether a special relationship existed between defendants and their residents giving rise to a duty owed to the public to exercise reasonable care to control the criminal conduct of their residents.*" *Id.* at 955–56 (emphasis added). On this second question, *Rice*'s outcome, like *Beauchene* and *Cardenas*, was driven almost exclusively by public policy. The court first noted that, "[i]n *Beauchene*, . . . the court concluded that *public policy considerations preclude* the imposition of such a duty on the operators of a rehabilitation facility." *Id.* at 956 (emphasis added). The court then rejected the plaintiff's attempts to distinguish *Beauchene* and *Cardenas*, based on the fact that the *Rice* defendants had violated mandatory rules, reasoning that "[the facility]'s failure to follow applicable operational policies or procedures *did not give rise to a duty where none otherwise existed.* Defendants' failure to comply with applicable safety regulations would at most demonstrate a lack of reasonable care, i.e. breach of the duty of care if such a duty were first determined to exist." *Id.* at 958 (emphasis added).

Reading these cases as a whole makes clear that rather than two separate lines of cases—one dealing with doctors and the other dealing with rehabilitation facilities—this is a single line of cases dealing with the fundamental duty to

control or warn, based on a special relationship, which has developed (sometimes awkwardly) over nearly 50 years. This line of cases begins with the general rule that a defendant has no duty to warn third parties who are harmed by a tortfeasor. An exception to this rule based on "special relationships" was recognized by the California courts in *Poncher* (1966) and *Johnson* (1968). In these cases, the court unequivocally said there was a duty to warn and/or control a person who posed a risk of harm to third persons which was reasonably foreseeable. (*Tarasoff* further refined this duty with respect to specifically identifiable victims in certain circumstances.) In the decisions that followed, the courts enacted a judicially created immunity for private rehabilitation facilities and similar programs based on important public policy considerations (an exception to the exception, so to speak). And where these policy considerations have not been present (mostly in the physician and psychiatrist context), the Court has continued to apply the *Poncher*/*Johnson* duty analysis.

Moreover, a slight but important refinement of the case law occurred with *Myers*, which clarified that a victim must be "foreseeable," but need not be "readily identifiable." *Myers*, 144 Cal. App. 3d at 892.[5] Instead, *Myers* and subsequent cases dealing with victims who were not readily identifiable, focus on whether the proposed action that the defendant failed to take would have been "reasonable" given

---

[5] The district court here relied on *Vu* for the proposition that "one must know that the target of the risk is an identifiable and foreseeable victim." *Dugard v. United States*, No. 3:11-cv-04718-CTB, 2013 WL 6228625, at *9 (N.D. Cal. Nov. 27, 2013). But *Vu* was decided before *Myers*, which clearly states that "the fact [that the plaintiff] was a foreseeable but not a readily identifiable victim . . . does not preclude him from stating an action." *Myers*, 144 Cal. App. 3d at 892.

the facts of the case and public policy, and whether or not it would have been "futile." *Id.* at 892–93. The only exception is *Rice*, which did not reach the issue of whether a warning would have been futile because it found that "public policy considerations *preclude[d]* the imposition of such a duty on the operators of a rehabilitation facility." 154 Cal. App. 4th at 956 (emphasis added). This is the same public policy mandate that drove the decisions in the earlier rehabilitation cases. *See Cardenas*, 193 Cal. App. 3d at 335–36 ("Such programs, particularly in these times of overcrowded penal facilities, serve an *indispensable public function*. Forced to choose between the competing interests presented in this case, we must, like the *Beauchene* court, without in the least minimizing the seriousness of the injury to the individual, defer to the *imperative policy objective* of encouraging innovative release and rehabilitation programs for criminal offenders." (emphasis added)); *Vu*, 706 F.2d at 1030 ("[T]he same public policy that moved the Legislature to immunize *public* release and rehabilitation programs from liability—to encourage such innovations in the interests of criminal justice—*compels the conclusion* that respondent's *private* release and rehabilitation program owed no legal duty to this appellant." (second emphasis added; first and third in original)).

Critically, nothing in *Myers* limits its holding to a doctor-patient relationship. And the court had that opportunity: in distinguishing *Thompson*, the court could have said that the duties that exist in the doctor-patient context do not exist in other special relationships. Instead, the *Myers* court found that, unlike in *Thompson*, it could not "factually presume Hansen would have ignored the doctors' warning." *Myers*, 144 Cal. App. 3d at 893. In *Thompson*, by contrast, the majority found that all of the suggested warnings—including

warning the mother, about which the dissent disagreed—
would have been futile, and further, would have created bad
public policy.  27 Cal. 3d at 756.  However, in cases where
there is a third party who can be "effectively warned of the
danger," *id.* at 758, or another action that could easily be
taken to prevent the harm without creating bad policy, *there
is a duty*.  *See Bragg*, 111 Cal. App. 4th at 431–34; *Reisner*,
31 Cal. App. 4th at 1198–1203; *Myers*, 144 Cal. App. 3d at
892–94.

## II.  Most Analogous Private Party

With this backdrop in mind, I turn to determining whether
"a private individual under like circumstances," 28 U.S.C.
§ 2674, to Defendant would be held liable under California
law.

The two most recent cases—*Bragg* and *Rice*—are both
progeny of *Poncher* and *Johnson*, and both present
potentially compelling analogies:  a psychiatrist who released
a mentally ill and dangerous patient into society, and a private
rehabilitation facility from which several inmates escaped.  In
both of these cases, like in the instant case, the question was
whether a party responsible for a dangerous person having the
opportunity to commit a crime could be held liable for the
harm caused.  Yet the California courts came to opposite
conclusions: while the psychiatrist was held liable, the private
rehabilitation facility was not.  The question is why the
opposite results?  The answer to that question reveals which
case is more analogous to this one.

Taking a close look at these cases, it becomes clear that
*Bragg*, not *Rice*, presents the "like circumstances" to this
case under California law.  The majority simplistically

characterizes my argument as preferring "a line of California cases, particularly involving medical professionals," Majority at 12, to the private rehabilitation cases. But as my analysis above demonstrates, the majority clearly misses the point—we are dealing here with one line of cases, typified by the physician and psychologist examples, to which there is an exception for private rehabilitation facilities based on policy grounds. Although I concede that it is tempting to conclude, as the majority has, that because this case deals with the prison system rather than the medical system, *Rice* seems more analogous; but that is a red herring that distracts from the real comparison. The public policy considerations that dictated the result in private rehabilitation cases like *Rice* (the need for immunity and the futility of the putative warning) simply do not exist in this case. Instead, the policy motivations and the futility question in the present case align much more closely to those in *Bragg* and demonstrate that a private person under circumstances similar to those here would be liable under California tort law.[6]

---

[6] A recent district court decision with analogous facts applied a similar approach, using "a person responsible for controlling the acts of a third party as described in Section 319 of the Restatement (Second) of Torts" as "the closest private analog." *Ben v. United States*, No. 5:14-CV-0370 (CJS), 2016 WL 447713, at *11 (N.D.N.Y. Feb. 4, 2016). In that case, a criminal defendant, Renz, who had been charged with receiving and possessing child pornography, was released from custody prior to trial and placed on electronic monitoring under the supervision of U.S. Probation and Pretrial Services Office for the Northern District of New York. *Id.* at *1. However, "Probation did not follow [its] procedures in Renz's case. More specifically, Probation did not develop a supervision plan for Renz, did not inspect Renz's electronic monitoring equipment (except perhaps on one occasion), and did not monitor Renz's tamper alerts as required even though tampering with 'location monitoring' equipment is considered a 'higher-risk violation.'" *Id.* at *3. While on supervised release, Renz committed crimes including kidnapping, rape, and murder.

In *Bragg*, the court determined that "[p]reventing future incidents is [] furthered by imposing a duty to the injured party." 111 Cal. App. 4th at 431. Simply put, public policy favored imposition of a duty on hospitals to refrain from releasing dangerous patients simply because they do not have insurance. Moreover, the action required—not releasing the patient—clearly would not have been futile; it would have prevented the patient from committing the tort.[7] By contrast, in *Rice*, the court found that "public policy considerations *preclude* the imposition of such a duty on the operators of a rehabilitation facility." 154 Cal. App. 4th at 956. The court in *Rice* explained that "[w]ere we to find a cause of action

---

The court denied the government's motion to dismiss the FTCA claims against the government, finding that Probation "had sufficient control over Renz to support a duty under § 319." *Id.* at *14. In doing so, the court rejected the government's argument that someone on supervised release is more akin to a voluntary outpatient of a medical/psychiatric facility (where New York courts had found no duty), as opposed to someone involuntarily committed to a psychiatric facility (where courts had found a duty), because supervised release is not "in custody." *Id.* Like in the instant case, on the surface, the outpatient cases looked more analogous because Probation did not have "actual physical custody of the dangerous third person"; however, the court looked past the seemingly similar circumstances in the outpatient cases and interpreted them "as holding that because the medical/psychiatric facilities had no other way of controlling the third parties' actions when they were away from the facilities," there was no duty. *Id.* Probation, by contrast, "had a relationship of control over Renz that did not require actual physical custody." *Id.*

[7] It is important to keep in mind that *Bragg*'s outcome did not hinge on the existence of a doctor-patient relationship: The psychiatrist was liable because the negligence did *not* occur in the course of the doctor-patient relationship; had the inverse been the case, the psychiatrist would have had statutory immunity. 111 Cal. App. 4th at 432. Thus, it cannot be said that the particular contours of the doctor-patient relationship, as opposed to the duties in other "special relationship" cases, drove the result.

stated we would in effect be encouraging the detention of prisoners in disregard of their rights and society's needs." 154 Cal. App. 4th at 956 (emphasis added). As a practical matter, liability for private rehabilitation facilities would result in those facilities going out of business and a worsening of the already daunting prison crisis in California.

Here, the public policy concerns align much more closely to *Bragg* than *Rice* and the other rehabilitation center cases. The private rehabilitation facility cases turned on the assumption that imposing liability would be the death knell of such facilities and that it would be "incongruous" to attach liability to private facilities for actions for which their public counterparts were immune. These concerns simply do not exist in this case.

The majority suggests that the policy concerns that animated the private rehabilitation cases are equally present in the federal probation system, drawing support from a publication of the Administrative Office of the United States Courts, which contains some generic statements about flexible and innovative approaches to offender management and supervision. Noting that the goals of the parole and probation systems "rang[e] from protecting the public from further crime to providing the offender with needed education, vocational training, medical care, and other correctional treatment," Majority at 12 (quoting Probation Division, Administrative Office of the United States Courts, The Supervision Process, Publication 106, at 21 (1983), the majority posits that, "[i]mposition of broader liability logically forces this range of goals to shift to the former (protecting the public), and away from the latter (education, vocational training, medical, and correctional treatment)." *Id.* For the reasons outlined below, the majority's suggestion just

does not hold water:  the policy concerns of federal probation and parole are not at all aligned with the concerns described in the private rehabilitation cases.

To begin, the publication cited by the majority makes clear that parole and probation officers' *primary* responsibility is to keep apprised of and report on the behavior of the individuals they supervise, and the "flexible approach" must be consistent with those mandatory responsibilities:

> The supervision responsibilities of probation officers begin with the statutory obligation set forth at title 18, USC, 3665, "to keep informed concerning the conduct and condition of each probationer under supervision and report thereon to the court placing such person on probation."

> This function is also performed for persons on parole on behalf of the United States Parole Commission.  For offenders who do not abide by the conditions of supervision, *it is the responsibility of the probation officer to promptly report this information to the court or Parole Commission*.  The probation officer is also mandated by statute to "use all suitable methods, *not inconsistent with the conditions imposed by the court*, to aid probationers to bring about improvements in their conduct and condition."

Publication 106, at 2 (emphasis added).

Second, there is *virtually no risk* that imposing an obligation on federal parole officers to follow their mandatory reporting duties will result in fewer people being released on parole.  For starters, the U.S. Parole Commission effectively went out of business in the 1980s with the passage of the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1988 (codified at 18 U.S.C. § 3551, *et seq*.).  No offender has been put on parole in nearly 30 years.  The only function of the Parole Commission since 1988 has been the management of defendants who were paroled prior to that date.  Since the late 1980s, sentencing decisions lie exclusively with federal district judges, who prescribe both the length of incarceration and supervision, or, alternatively, non-incarcerative probation.  These decisions, of course, all enjoy judicial immunity, and no district judge worth his or her salt would ever decide to incarcerate a defendant for a longer period than required to meet the objectives of 18 U.S.C. § 3553 out of fear of creating liability for federal probation.  The idea is unthinkable.  To be sure, federal probation officers supervise defendants during their terms of supervised release or probation, but probation officials are not responsible for deciding when a prisoner gets released.  Consequently, there is *virtually no risk* that holding such officials responsible for negligence for their failure to perform nondiscretionary functions will in any way undermine new or creative rehabilitation programs, or result in defendants being kept in prison for longer than necessary.  Rather, imposing the duty of reasonable care called for by *Poncher*, *Johnson*, *Tarasoff*, and *Bragg*, will better ensure that U.S. Probation officers perform their duties carefully, and follow protocols dutifully, as they should, bringing violations to the attention of U.S. District Judges (or, in the present case, the U.S. Parole Commission).  Simply put, the concern of the California courts was that third party liability

to foreseeable (but not specifically identifiable) victims would make opening and operating private rehabilitation facilities financially untenable.  No such concern exists in the federal probation system.  Regardless of what liability exists for federal probation officers' misdeeds, U.S. Probation will continue to supervise defendants as directed by federal judges.

Third, the California courts' concern about holding private and public facilities to different standards is not at play here.  The Supreme Court of California recognized in *Johnson* that the policy considerations underlying the immunity provided by Section 845.8, did not apply in a situation like this one where the decision concerned "ministerial implementation" rather than a "policy decision[]":

> Once an official reaches the decision to parole to a given family, however, the determination as to whether to warn the foster parents of latent dangers facing them *presents no such reasons for immunity*; to the extent that a parole officer consciously considers pros and cons in deciding what information, if any, should be given, he makes such a determination at the lowest, ministerial rung of official action.  *Judicial abstinence from ruling upon whether negligence contributed to this decision would therefore be unjustified*; coupled with the administrative laxness that caused the loss in the first instance, *it would only result in the failure of governmental institutions to serve the injured individual*.

*Johnson*, 69 Cal. 2d at 795–96 (emphasis added);**[8]** *see also Vu*, 706 F.2d at 1029 ("California courts have recognized that [section 845.8] provides an *exception* to the rule that special relationships can result in creation of duty." (emphasis added)). Here, the challenged action (or in this case inaction) is not the policy decision that was made to release Garrido on parole, nor is it the policy decision that would have been in the Parole Commission's discretion to revoke his parole; it is simply the parole officer's ministerial task of *reporting* Garrido's numerous drug violations to the Commission. Thus, the evaluation in the rehabilitation facility cases that "the same public policy that moved the Legislature to immunize *public* release and rehabilitation programs from liability [under section 845.8]—to encourage such innovations in the interests of criminal justice—compels the conclusion that respondent's *private* release and rehabilitation program owed no legal duty to this appellant," *Cardenas*, 193 Cal. App. 3d at 335 (emphasis in original) (quoting *Beauchene*, 88 Cal. App. 3d at 348), does not apply to these facts. Moreover, the innovation currently taking place in the federal system is being driven primarily by the courts. To be sure, probation offices in innovative courts play a critical programmatic role, but the policy decision of whether to adopt a re-entry program or drug court or diversion program is a judicial function, not a probation function, so it cannot be said that imposing liability for probation officers' misdeeds will stifle innovators and increase incarceration.

---

**[8]** As *Johnson* and *Thompson* were both public entity cases, they cannot be used as specific examples of a private person in like circumstances. However, as the majority notes, they nonetheless provide the foundation for the California tort law concepts and public policy issues at play in this case.

Fourth, this is not a situation where imposing liability would result in "frequently repeated [warnings that] would do little as a practical matter to stimulate increased safety measures" and "would be difficult to give." *Thompson*, 27 Cal. 3d at 755. Indeed, unlike the police and the mother in *Thompson*, the Parole Commission did have an affirmative duty to act upon receipt of the warning, and presumably would have acted in this case. So, futility too is not a concern.

In contrast, similarities between the public official actor in this case and the private actor in *Bragg* are numerous. Like *Bragg*, "[t]his case is not dealing with judgment calls, but a dereliction of judgment." *Bragg*, 111 Cal. App. 4th at 435. Here, a parole officer failed to report over 70 drug violations for a parolee who was known to be extremely violent when under the influence of drugs. And in this case, like in *Bragg*—which analyzed the contours of the duty because the immunity and public policy issues that are peculiar to the private rehabilitation facilities were not applicable—"[p]reventing future incidents is [] furthered by imposing a duty to the injured party." 111 Cal. App. 4th at 431. Indeed, if the prevailing public policy in California is to encourage alternative rehabilitation programs, applying the same duties to parole officers as those applied to physicians in *Bragg* and *Myers* would advance that policy. As many of the private rehabilitation cases note, there is an inherent risk involved in paroling criminals, a risk that is considerably exacerbated by parole (or probation) officers disregarding their responsibilities to the degree they were disregarded in this case. Mitigating the risk of danger associated with parole or probation/supervision by holding parole and probation officers responsible for carrying out their mandatory tasks, makes it more likely, not less, that the public and government

officials, and more importantly judges and prosecutors, will support expansion of alternative rehabilitation programs. And moreover, imposing a duty on parole officers to conscientiously do their jobs has the added benefit of protecting the public during the expansion of these programs. In essence, the same public policy that drove the result in *Bragg* applies in the context of federal parole and supervision.

Indeed, just as in *Bragg* "the burden to the defendant"—here, that parole and probation officers follow mandatory reporting guidelines that they should be following anyway—is low; and, unlike in the private rehabilitation cases, the "consequences to the community of imposing a duty to exercise care with resulting liability for breach" are positive. *See Myers*, 144 Cal. App. 3d at 894 ("There also are no significant practical problems involved here in requiring physicians to warn patients not to engage in foreseeably dangerous conduct. . . . Our holding does not require the physician to do anything other than what he was already obligated to do for the protection of the patient."). As described above, imposing liability would increase the likelihood that officers will perform their duties, which in turn would enhance public safety, which in turn would increase the support for alternative rehabilitation programs.

Finally, as if more were needed, there is in this case a specific party to warn which had control of the wrongdoer by virtue of his status as a parolee: the Parole Commission. And the Court here cannot say that, as a matter of law, such a warning would have been futile.

To sum up then, the FTCA requires this Court to look to the closest private sector analogue to determine if a private

party would have a duty in like circumstances. The line of cases we should look to is the "duty to control/duty to warn" cases which represent the special relationship exception to the general rule that there is no duty to third parties harmed by the wrongdoer. That line of cases has its roots in *Poncher* and *Johnson*. And as the cases have developed, an exception to the special relationship exception has evolved where public policy considerations demand parity for private rehabilitation facilities with the immunity afforded to public facilities, and/or where the warning suggested would be futile. Where neither of these policy-based concerns is present, the courts have continued to find a duty to control or warn, evidenced by *Bragg* (control), *Tarasoff*, *Myers*, and *Reisner* (warn). Here, the policy considerations undergirding the rehabilitation center exception cases are plainly not present, and the warning/control that Plaintiff claims should have been made both would likely have been effective and would have promoted exactly the behavior that tort law is meant to promote: greater care, vigilance, and concern for the safety of foreseeable victims.[9]

For all of these reasons, I would reverse the district court's grant of summary judgment.

---

[9] The government also argues that Dugard's claims are barred by the discretionary function exception of the FTCA and that there is insufficient evidence for a factfinder to determine that the parole officers' alleged failure to report Garrido's drug violations to the Parole Commission proximately caused Dugard's harm. I agree with the district court's analysis and decision on these two issues and would find that neither provides grounds to bar Dugard's claims.